**MASSMAN CONSTRUCTION COMPANY and Triad Equipment Co., Inc., Plaintiffs,**

v.

**SIOUX CITY & NEW ORLEANS BARGE LINES, INC., Defendant.**

**No. 20418–1.**

United States District Court, W. D. Missouri, W. D.

Jan. 9, 1979.

As Amended Jan. 15, 1979.

F. Philip Kirwan, Margolin & Kirwan, Kansas City, Mo., for plaintiffs.

Alvin D. Shapiro, Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, Mo., Gary T. Sacks, Goldstein & Price, St. Louis, Mo., for defendant.

## MEMORANDUM OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

OLIVER, Chief Judge.

This admiralty case was originally commenced by Massman Construction Company. At the outset of the trial, by agreement of counsel, Triad Equipment Co., Inc., was added as a party plaintiff. (Tr. 5). After taking evidence for several days, the parties further agreed to the entrance of an order pursuant to Rule 42(b), F.R.Civ.P., separating the issue of liability from damage and establishing a schedule for the submission of post-trial briefs, proposed findings of fact and conclusions of law. The case therefore presently pends for final decision on the issue of liability alone.

For the reasons which we shall state, we find and conclude on the issue of liability that judgment should be entered for defendant and against plaintiffs.

## I.

### FINDINGS OF FACT

The following findings of fact are not disputed by the parties. Each finding has been adopted either from the factual stipulations contained in Standard Pretrial Order No. 2 or the admitted facts produced by post-trial briefing.

1. Plaintiffs bring this action to recover damages from the loss of the MCC–36 allegedly due to the negligence of the defendant while defendant was towing the MCC–36 from a point near Caruthersville, Missouri, to St. Louis, Missouri, on the Mississippi River.

2. Federal jurisdiction is invoked under the Admiralty and Maritime jurisdiction of the Court pursuant to the provisions of 28 U.S.C. § 1333.

3. The MCC–36 consisted of a barge known as the Triad 4 and a Wiley steam whirley crane, which was permanently affixed thereto.

4. The barge was owned by Triad Equipment Co., Inc., a Delaware corporation, with its principal place of business located in Kansas City, Missouri. At all times herein concerned the barge was rented to plaintiff Massman Construction Company.

5. The Wiley steam crane was owned at all times concerned by plaintiff Massman Construction Company.

6. Defendant Sioux City & New Orleans Barge Lines, Inc., was the owner and operator of a 130 feet long and 40 feet wide river towboat known as the M/V WALTER STEPHENS COX, powered by two diesel engines which developed a total of 4300 horsepower.

7. The barge Triad No. 4 was purchased from Triad Equipment Co. on February 2, 1953.

8. The barge in question was 70 feet long, 44 feet wide, and 6 feet, 3 inches deep. Plaintiffs are unable to produce maintenance or repair records for the barge and/or crane. Its hull never had been replated, and it had never been drydocked.

9. One of the basic purposes of a drydock examination is to determine whether the bottom of a barge is rusted, deteriorated and/or in need of replating.

10. The barge had never been subjected to a stability test to determine whether it could be transported safely up and down the river.

11. The last river trip made by the MCC–36 prior to the casualty on December 23, 1971, was in June, 1969.

12. When the MCC–36 was picked up by the defendant it was riding trim and level in the water, and a visual inspection showed no appreciable amount of water was accumulated inside the barge.

13. On December 22, 1971 Captains Leman Lane and Samuel Anderson of the M/V WALTER STEPHENS COX were advised to pick up a crane barge at Mile 838, on the Lower Mississippi River.

14. On December 23, 1971, at plaintiffs' request, defendant picked up the MCC–36 at Mile 838 on the Lower Mississippi River near Caruthersville, Missouri, for the purpose of towing it to St. Louis, Missouri.

15. The tow of the M/V WALTER STEPHENS COX, at the time the MCC–36 was added, consisted of thirteen (13) barges, twelve (12) loaded and one (1) empty. The barges were arranged in three (3) vertical strings of four (4) barges each, with the one (1) empty barge secured at the head of the tow, alongside of the port lead barge. Twelve (12) of the barges were standard jumbo barges, measuring 195' × 35', and one was of an odd size.

16. At about 6:00 a. m. on December 22, 1971, Captain Leman Lane of the M/V WALTER STEPHENS COX radioed plaintiff's TUG BILL O'DONLEY and learned that the MCC–36 was moored on the left descending side of the Mississippi River; that it appeared in good condition; that its freeboard was about three feet; and that one end of the barge was raked but the stern contained a square headlog.

17. Captain Lane advised the Captain of the TUG BILL O'DONLEY that he would probably want the crane barge placed at the head of his tow.

18. At approximately 2:30 a. m. on December 23, 1971, the M/V WALTER STEPHENS COX and its tow arrived at Mile 838 on the Lower Mississippi River and found the MCC–36 tied off on the left descending shore of the river.

19. At approximately Mile 838, a mate and three deckhands employed by defendant moved to the head of the tow, anticipating the addition of the MCC–36.

20. The MCC–36 was added to the tow of the M/V WALTER STEPHENS COX by the crew members of that vessel and the equipment so used was owned by defendant.

21. The MCC–36 was wider than the barges in the tow and extended over the starboard side of the center barge by five or six feet.

22. The MCC–36 was secured to both the starboard barge and the center barge.

23. The deck of the MCC–36 was approximately one foot below the bottom of the headlog of the starboard barge; however, the underslung towknees of that barge fit against the end of the MCC–36.

24. The center barge rode lower in the water than the starboard barge and accordingly both its headlog and its underslung towknees fit against the headlog of the MCC–36.

25. At the time the MCC–36 was rigged to the tow of the M/V WALTER STEPHENS COX, the MCC–36 appeared to be floating trim and level in the water.

26. At approximately 3:00 a. m., December 23, 1971, in fair weather and calm waters, the M/V WALTER STEPHENS COX and its tow, including the MCC–36 proceeded upriver.

27. Captain Anderson navigated the flotilla upriver until 6:00 a. m., when he turned over the controls of the M/V WALTER STEPHENS COX to Captain Leman Lane at about Mile 850.

28. The trip from the point where the MCC–36 was picked up, at approximately Mile 838, through 6:00 a. m., at about Mile 850, was uneventful.

29. At 6:00 a. m., when Captain Lane took over the controls, the flotilla was in the navigable channel, the weather was clear, and the river was calm.

30. Captain Lane thereafter navigated the flotilla for six hours, at which time the M/V WALTER STEPHENS COX and its tow reached Mile 876. During his six-hour tow of duty, Captain Lane did not experience any difficulty in the handling of the tow, and the trip was uneventful. The weather and river conditions remained calm and clear.

31. The M/V WALTER STEPHENS COX, with the MCC–36 in tow, proceeded up the Mississippi River uneventfully until about 12:30 p. m. on December 23, 1971, when the flotilla reached about Mile 878 on the Upper Mississippi River. At said time and place the MCC–36 suddenly ". . . listed to the starboard and then immediately after it listed . . . it shifted to the port across the head of my tow and immediately after it shifted to the port it remained tilted over to the starboard and started to shear around, top around in front of the tow, which means turn to the port in front of my tow and, while it was turning, it continued to list over to the starboard until it completely capsized."

32. At the time of the sinking, the M/V WALTER STEPHENS COX was traveling full speed ahead at four miles an hour in a current.

33. Following the sinking the crew members of the M/V WALTER STEPHENS COX proceeded to the head of the tow and found the MCC–36 in an upside-down position and caught on the towknees of the barges at the head of the tow.

34. Thereafter, the MCC–36, in an upside down position, but still afloat, at the head of the tow of the M/V WALTER STEPHENS COX, was moved to the left descending bank where it was beached in an upside down position and tied off to a tree.

## II.

### DISCUSSION OF APPLICABLE LAW

The basic legal principles applicable to this admiralty case are well settled. The lead case is *Stevens v. The White City*, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699 (1932). That case or its principles are cited in every case cited by the parties. *Stevens* held that:

Decisions of this Court show that under a towage contract the tug is not a bailee of the vessel in tow or its cargo. And it is established here and by numerous rulings of lower federal courts that evidence showing a tug's receipt of a tow in good order and delivery in damaged condition raises no presumption of negligence. [*Id.* at 200, 52 S.Ct. at 349].

After noting the inapplicability of the law of bailment in such cases, the Court further stated that an action by the owner of a tow against the owner of a tug to recover for the alleged negligence of the tug is an action in tort, and not contract. Therefore, the Court described the duty of the tug as follows:

While respondent [tug owner] was not an insurer or liable as a common carrier, it owed to the owner of the *Drifter* the duty to exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service. The burden was upon petitioner [tow owner] to show that the loss for which he sought recovery was caused by a breach of that duty. The mere fact that the *Drifter* was in good order when received by respondent and in damaged condition when delivered does not raise any presumption of fault. As said by this court in *The L. P. Dayton, supra*, ([120 U.S.] p. 351, [7 S.Ct. 568, 574, 30 L.Ed. 669]): "To hold otherwise would require that in every case, as between the tow and its tug, the latter should be required affirmatively to establish its defence against the presumption of its negligence. . . . [p. 352 (7 S.Ct. 568, 30 L.Ed. 669).] Neither is it material that the facts of the case, and the causes of the collision, are peculiarly within the knowledge of the respondents." [*Id.* at 202, 52 S.Ct. at 350].

The Court emphasized that the tow could not recover under the facts presented in *Stevens* for the reason that:

The burden of proof as to respondent's negligence remained upon petitioner [tow owner] throughout the trial. His contentions clearly show that the evidence leaves the time, place, and cause of the injury in the realm of conjecture. The

evidence is consistent with an hypothesis that the tug was not negligent and with one that it was, and therefore has no tendency to establish either. [*Id.* at 203–204, 52 S.Ct. at 350].

The principles articulated in *Stevens* were most recently applied by our controlling Court of Appeals in *Mid-America Transportation Co. v. National Marine Service and M/V National Progress*, 497 F.2d 776 (8th Cir. 1974) and 526 F.2d 629 (8th Cir. 1975), *cert. denied*, 425 U.S. 937, 96 S.Ct. 1671, 48 L.Ed.2d 179 (1976). See also, *Mid-America Transportation Co. v. Rose Barge Line*, 477 F.2d 914 (8th Cir. 1973), affirming Judge Webster's district court judgment reported in 347 F.Supp. 566 (E.D. Mo.1972).

While plaintiffs purport to accept the principles stated in *Stevens* as the principles to be applied in this case, it is clear that the main thrust of plaintiffs' legal theory rests not upon *Stevens* but upon principles first stated in *The Steamer Webb*, 81 U.S. 406 (14 Wall.) 20 L.Ed. 774 (1871).

*The Steamer Webb* dealt with particular factual circumstances under which, if proven, a "duty of explanation" may be cast upon the tug. The Court stated in *The Steamer Webb* that:

The burden is always upon [the plaintiff] to show * * * that there has been negligence * * *. Unlike the case of common carriers, damage sustained by the tow does not ordinarily raise a presumption that the tug has been in fault. * * * But there may be cases in which the result is a safe criterion by which to judge of the character of the act which has caused it. Had the ship in this case been towed upon a shoal ten miles [off-course], it cannot be doubted that the fact of the stranding at such a place, would, in the absence of explanation, be almost conclusive evidence of unskilfulness or carelessness in the navigation of the tug. * * * At least [it] would be sufficient to cast upon the claimants of the tug the burden of establishing some excuse * * *.

In the present case the departure from the true course was not so great, but it was enough to devolve upon the tug the duty of explanation. [*Id.* at 414].

Plaintiffs make clear that the real basis of their legal claim rests upon the principles applied in *The Steamer Webb* and the progeny of that case rather than those stated in *Stevens* and its progeny. In their Post-Trial brief plaintiffs state at page 18 that "[A]lthough the burden of proof is upon the plaintiff to show there has been negligence, *a duty is placed upon the defendant to come forward and furnish a reasonable explanation for the casualty.*" (Emphasis ours). For other examples of plaintiffs' contention, see plaintiffs' Post-Trial Reply brief at pp. 1, 7, 17 and 18; and plaintiffs' Proposed Conclusions of Law, ¶¶ 13 and 14.

In support of their "duty of reasonable explanation" contention, plaintiffs rely most heavily on *Bisso v. Waterways Transportation Co.*, 235 F.2d 741 (5th Cir. 1956), and *Mid-America Transportation Co. v. National Marine Services*, 497 F.2d 776 (8th Cir. 1974). Both cases are distinguishable on their respective facts. *Bisso* involved "somewhat technical problems" of navigation and the Fifth Circuit's review of the whole record produced a "definite conviction that the stranding clearly ought not to have taken place." In reliance upon principles stated in *The Steamer Webb*, the *Bisso* court concluded that "a stranding which occurs under circumstances which ordinarily results in no such casualty puts on the tug the obligation of some satisfactory explanation." (235 F.2d at 744). The case at bar presents an entirely different set of factual circumstances.

In *Mid-America Transportation Co.*, the Eighth Circuit was required to review a case in which the trial court had "inferred that a grounding had occurred" but stated that it was "unable to determine the object on which the barge was grounded, [or] the specific time and the location of the grounding." (497 F.2d at 777 and 778, respectively).

Citing both *Stevens* and *The Steamer Webb*, the Eighth Circuit stated that "the law concerning contracts of towage has been settled in an abundance of cases." (*Id.* at 778–779). Specifically, the court noted that the parties conceded that:

With respect to the grounding cases, the position of the grounded vessel at time of striking is, without more, of paramount importance. If she is outside the channel she has left it at her peril, and her grounding will not be excused on the argument that, possibly, her obstruction was unknown. If she is inside the channel and strikes an unknown obstruction it is equally settled that she is not presumed to be negligent but, *per contra*, if the object in the channel be known, and nevertheless struck, her negligence may be presumed. [*Id.* at 779].

On the second appeal in *Mid-America*, reported in 526 F.2d 629, a different panel of the Eighth Circuit again took note of the parties' agreement concerning the settled applicable admiralty law by stating that:

It was conceded that if the grounding took place outside the channel or on a known obstruction in the channel that the tug owner was liable. On the other hand, if the grounding took place on an unknown object in the channel the tug owner was not to be presumed negligent.

After receiving additional evidence, after remand in accordance with the mandate of the first appeal, the trial judge in *Mid-America* was able to locate "the position of the grounded vessel at time of striking," a fact of "paramount importance," as stated in the first appeal (497 F.2d at 779). On the second appeal, the trial court's express finding that "the M/V National Progress and its tow were in channel and did not hit a known obstruction while within the channel" was found to be not clearly erroneous and the trial court's judgment for the tug was accordingly affirmed.

*Mid-America* is distinguishable on its facts from the case at bar for the reason that there is no claim that the tug or tow ever grounded in or out of channel or that the casualty resulted from the striking of any sort of obstruction, either known or unknown, in the river. As we shall later develop in greater detail, plaintiff failed to

adduce sufficient evidence to carry the burden of establishing that either the tug or the tow was ever outside of channel, a factual circumstance of paramount importance under the circumstances of this case.[1]

The parties agreed in Standard Pretrial Order No. 2 that among the facts which remained for litigation were:

"4. Did Plaintiffs tender to Defendant a seaworthy barge and crane?"

"5. If not, did the unseaworthy condition cause or contribute to the casualty?"

In similar manner the parties agreed that among the issues of law which remained for litigation was:

"2. Was Barge MCC–36 unseaworthy when tendered to Defendant for transportation, and did such seaworthiness cause or contribute to the casualty?"

Plaintiffs argue that "[T]he uncontroverted evidence of record demonstrates that the MCC–36 was, at the time of delivery, a seaworthy vessel." Plaintiffs' Post-Trial brief, at p. 22. Plaintiffs suggested in their Proposed Conclusions of Law that we conclude as a matter of law that:

"12. The MCC–36 . . . was seaworthy and sufficiently staunch and strong to withstand ordinary perils at the time of delivery to defendant Sioux City and New Orleans Barge Lines, Inc."

Under the cases which we will presently cite, we find and conclude that plaintiffs' argument that the MCC–36 was seaworthy is untenable.

In support of their argument that the MCC–36 was seaworthy, plaintiffs argue that certain "inspections" of the MCC–36 conducted by plaintiffs' employees "re-vealed the timberheads and associated equipment were in good shape, secured to the deck and . . . such an insufficient quantity of water in the hull that a pump could not pump it out." See plaintiffs' Post-Trial brief, at p. 23. Plaintiffs' argument must be considered in light of a number of additional settled principles of admiralty law which relate to the seaworthiness of a damaged or sunken vessel. The relevant admiralty principles are:

1. The tow, in offering its vessel for tow under a contract of towage, holds itself out as being sufficiently staunch and strong to withstand the ordinary perils to be encountered on the voyage. If the tow is unseaworthy by reason of weakness, decay, or leaks and such defects are not obvious to the master of the tug, the tug will be absolved from responsibility for such unseaworthiness if it be the cause of the damage complained of. This principle is commonly referred to as the warranty of seaworthiness. See, *The Edmund L. Levy*, 128 F. 683 (2d Cir. 1904); *Frederick Snare Corp. v. Moran Towing and Transportation Co.*, 195 F.Supp. 639 (S.D.N.Y.1961); *South v. Moran Towing and Transportation Co.*, 252 F.Supp. 500 (S.D.N.Y.1965) *aff'd*. 360 F.2d 1002 (2d Cir. 1966); *Derby Co. v. A. L. Mechling Barge Lines*, 258 F.Supp. 206 (E.D.La.1966) *aff'd*. 399 F.2d 304 (5th Cir. 1968); *Valentine Waterways v. Tug Choptank*, 260 F.Supp. 210 (E.D.Va.1966) *aff'd*. 380 F.2d 381 (4th Cir. 1967).

2. In addition to the warranty of seaworthiness, a related principle of law has been settled. While the owner of the tow warrants the seaworthiness of its vessel, the owner of the tug may rely on said warranty

---

1. Plaintiff also relied in support of its duty of reasonable explanation contention on *Tidewater Marine Activities v. American Towing Co.*, 437 F.2d 124 (5th Cir. 1970). Plaintiffs' brief, at pp. 19–22. The day after the sinking of plaintiff's vessel in *Tidewater Marine Activities*, the vessel was raised and examined. As a result of this examination the parties agreed at trial that the steel hull of plaintiff's vessel was watertight. The undisputed watertight integrity of the hull led the court to the conclusion that water must have come over the bow and not through the hull as defendant argued. Ac-cordingly, the court concluded that plaintiff's vessel was seaworthy and therefore plaintiff has adduced sufficient evidence to establish that defendant had failed to exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service.

The key evidence regarding the watertight integrity of the towed vessel's hull in *Tidewater Marine Activities* is totally lacking in this case. Therefore, plaintiffs' reliance on *Tidewater Marine Activities* to support a finding of liability in this case is untenable.

and is under no duty to make detailed inspection of the vessel either prior to the voyage or during the voyage itself. The tug is entitled to assume that the vessel it is towing is seaworthy. See, *Nat G. Harrison Overseas Corp. v. American Tug Titan*, 516 F.2d 89 (5th Cir. 1975); *Choctaw Transportation Company v. Ford Construction Co.*, 193 F.Supp. 922 (N.D.Miss.1961); *A. S. Wickstrom v. The Julia C. Moran*, 190 F.Supp. 250 (S.D.N.Y.1960).

■ 3. When a tow sinks under normal conditions and in the absence of proof that she was improperly handled, it is presumed that the tow was unseaworthy. See, *Valentine Waterways, supra*, at 214; *South, Inc., supra*, at 505; *Frederick Snare Corp., supra*, at 642; *Derby Co., supra*, at 211.

■ The admiralty principles above stated, particularly as they have been applied in cases such as *South v. Moran Towing and Transportation Co.; Frederick Snare Corp. v. Moran* ; and *Derby Co. v. A. L. Mechling Barge Lines*, reflect the continuing force of the burden of proof principles articulated by the Supreme Court in *Stevens v. The White City*. It is clear that, unless a tow can establish a breach of the tug's "duty to exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service," (*Stevens*, 285 U.S. at 202, 52 S.Ct. at 350), the tow simply cannot recover under the facts of a particular case.

■ If, on the other hand, a tow is able to carry the burden of proving that the tug was guilty of some specific act of negligence or that the tug failed to exercise reasonable maritime skill under the factual circumstances of a particular case, such proof would overcome any difficulty that the tow would otherwise encounter in regard to the application of any possible "presumption of unseaworthiness." It is therefore clear that preliminary inquiry must be made in regard to the factual question of whether plaintiffs have sustained their burden of establishing a breach of the "duty to exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service."

■ We now turn to our examination of the evidence to determine whether plaintiffs have carried the burden of proof imposed upon them by settled admiralty law. On the facts, plaintiffs argue that the "MCC–36 was, by defendant, [1] improperly placed at the head of the tow, [2] insecurely tied to said tow and was sunk at Mile 878 on the Upper Mississippi River while [3] defendant negligently and imprudently navigated a bend in the river." See, plaintiffs' Post-Trial brief, at p. 2. For reasons which we shall state, we find and conclude that plaintiffs failed to establish by the greater weight of the credible evidence that the MCC–36 was either [1] "improperly placed at the head of the tow," [2] "insecurely tied to said tow," or [3] "that defendant negligently and imprudently navigated a bend in the river."

### Improper Placement

Plaintiffs proposed the following conclusion of law:

4. Defendant, Sioux City and New Orleans Barge Lines, Inc., breached the foregoing duty in that it negligently and improperly placed the MCC–36 in a position of peril at the head of the tow, 800 feet in front of a wheelhouse and outside the view of defendant's pilot.

Plaintiffs' argument in support of that conclusion is stated in their Post-Trial brief, pages 6–8. See also, plaintiffs' Post-Trial Reply brief, at pp. 6, 15.

The only evidence relied upon by plaintiffs to support their proposed conclusion of law is the deposition testimony of Captain James Crouch, captain of plaintiff-Massman Construction Company's *TUG BILL O'DONLEY*, and Billy Joe Caldwell, one of plaintiff-Massman Construction Company's deckhand employees. Plaintiffs cite Crouch Depo. pp. 36–37, 41, 44–45, 47, 57–58, and Caldwell Depo. pp. 11–14, 15, 16, 17, 18–19, 31–35. See, plaintiffs' Post-Trial brief, at pp. 7–8.

The testimony relied upon consists simply of: (a) Crouch's statement that he told defendant's Captain Lane not to place the MCC–36 at the head of the tow, (b)

Crouch's opinion that the MCC–36 should have been placed further back in the tow on the side, and (c) Caldwell's opinion that the MCC–36 should have been placed on the side and covered up with a barge coupled fore and aft. Plaintiffs made no inquiry of their expert, Captain Leonard W. Thompson, during trial concerning the proper placement of the MCC–36 either at the head or side of the tow.

Defendant relies upon the testimony of Captain Leman Lane and defendant's expert, Captain Ralph F. Clark. See, Tr. 255–259, 347, 360–363, Lane Depo. pp. 16–20. That testimony supports defendant's position that the placement at the head of the tow was proper. In addition, defendant's expert, Captain Clark, testified that plaintiffs' suggestion of placing the MCC–36 on the side of the tow was unsafe. See, Tr. 582–584, 586.

We find and conclude that plaintiffs failed to establish by the greater weight of the credible evidence that defendant was negligent in its placement of the barge at the head of the tow. The undisputed evidence reflects that the voyage from Mile 838 to 876 necessitated the navigation of five pronounced bends in the Mississippi River; all of which were negotiated without difficulty and at all times up to Mile 876 the MCC–36 appeared to be floating trim and level in the water. See, Ct.Ex. No. 1; SPO # 2, ¶ 8; and Tr. 51, 261. Although our finding and conclusion that plaintiffs failed to sustain their burden of proving that defendant's placement of the MCC–36 at the head of the tow breached defendant's duty to plaintiffs obviates any necessity to resolve any conflict in the evidence adduced by the parties, we make the further alternative finding that the conflict of evidence on this particular factual question should be and is hereby resolved in defendant's favor.[2]

2. A related argument implicitly made by plaintiffs to support their proposed conclusion of law relating to alleged improper placement is the claim that the placement of the tow some 800 feet from the tug's wheelhouse put it outside the view of defendant's pilot and that such circumstance contributed to the alleged unsafeness of the placement at the head of the tow. While the record supports plaintiffs' contention

*Improper Rigging*

Plaintiffs' "improper rigging" specific negligence theory is stated in plaintiffs' Proposed Conclusions of Law as follows:

5. Defendant, in breach of the duty owed plaintiff, negligently rigged the MCC–36 to the starboardmost barge of the tow and the center barge of the tow in that after securing the MCC–36 to the tow there existed a three-foot difference between the deck of the MCC–36 and the deck of the starboardmost barge and the headlog of the forward starboard barge was a foot above the deck of the MCC–36. Further, after such placement, the center barge to which the MCC–36 was tied up was not the same height as the starboard barge, thus causing the wires from the starboardmost barge and center barge to the MCC–36 to run at different and excessive angles and thus subject them to excessive rubbing over the forward edge of the lead barge, resulting in decreased strength of such wires.

\* \* \* \* \* \*

7. Defendant, in breach of its duty to plaintiff, failed to secure the MCC–36 to the tow with cables and wires sufficiently staunch to secure said MCC–36 in tow and caused said wires to undergo excessive strain and wear by reason of the excessive angle of the lead wires resulting from the disparity in height between the starboardmost barge and the MCC–36.

The major thrust of plaintiffs' argument is stated on pages 10–11 of their Post-Trial brief. It is there stated that:

After the make-up the wires from the center barge to the MCC–36 were at a different angle from the wires from the starboard barge and the tow knees on the center barge and starboard barge rubbed

regarding the distance of 800 feet, the evidence concerning defendant pilot's view of the MCC–36 is wholly to the contrary. See, Anderson Depo. pp. 47–49. Accordingly, we find and conclude that this aspect of the evidence fails to support plaintiffs' proposed finding that the MCC–36 was "improperly placed at the head of the tow."

the MCC–36 at different areas (Tr. 318). After completion of the shackling of the barges, the wires which ran at different angles rubbed on the forward edge of the lead barge (Tr. 315; see also Plaintiff's Exhibit 84, which depicts the testimony of defendant's Mate Gibson).

Defendant's expert witness, Ralph Clark, testified that as the angle of such rigging increases, the longitudinal strength of the wire decreases, which would make the rigging break. (Tr. 365). A rig going fore and aft should not have more than a thirty degree angle. Captain Clark depicted the rigging and relationship of the barges in Defendant's Exhibit 136 which presents substantially the same evidence as given by Mate Gibson in Plaintiff's Exhibit 84. (Tr. 353–358). Since a normal fore and aft tie between two adjacent timberheads would have been impossible, Captain Clark conceded the tie was not standard. (Tr. 501).

Plaintiffs' improper rigging argument is based on factual circumstances relating to: (a) an alleged excessiveness in the angles of the shackling wires; (b) a "rubbing" phenomenon; and (c) the lack of "standardness" of the tie. We find and conclude that points (a) and (b) are unsupported by the factual evidence in the record, and that the testimony relied upon in regard to point (c) does not support an ultimate finding that defendant breached its duty of reasonable care and maritime skill.

The configuration of the starboardmost barge, the center barge and the MCC–36, which is described in our Findings of Fact ¶¶ 21–24, did produce the existence of angles in the shackling wires and some touching by the starboard wires on the forward edge of the lead barge. Plaintiffs' argument, however, is that defendant must be found to be negligent on the theory that the angles were "excessive" and the touching was actually a "rubbing."

Plaintiffs base that argument on defendant's expert testimony, defendant's Mate Gibson's testimony and plaintiffs' Exhibit 84 (an illustration of Mate Gibson's testimony). Defendant's Mate Thomas Gibson did testify that the wires "rubbed" on the edge

of the lead barge. See Tr. 315, see also P. Ex. 84. However, defendant's expert, on whom plaintiffs are relying, testified that while the wires touched there is no actual "rubbing" condition and in fact a round six (6)" plate is built on these barges to prevent rubbing in circumstances such as those in this case. See, Tr. 505–507. Further, defendant's expert testified concerning the angles of the rigging and its relevance to longitudinal strength. See, Tr. 365. The critical portion of that testimony on the issue of excessiveness of angles is that the rigging fore and aft should not have been more than a 30 degree angle. Despite noting this testimony (see plaintiffs' Post-Trial brief, at p. 11), plaintiffs adduced no evidence from defendant's employees, their own expert, or any other source as to what angle the wires actually were. Accordingly, we find and conclude that plaintiffs have failed to adduce sufficient evidence of either "rubbing" or "excessiveness of angles."

On the question of the "standardness of the tie," plaintiffs again attempt to rely on the testimony of defendant's expert. See, plaintiffs' Post-Trial brief, at p. 11, and plaintiffs' Proposed Findings of Fact, ¶ 32. A fair reading and understanding of defendant expert's complete testimony requires that we find and conclude that plaintiffs have failed to adduce sufficient evidence to demonstrate that the alleged lack of "standardness" establishes that defendant breached its duty of reasonable care and maritime skill. See, Tr. 501–505.

Another argument made by plaintiffs is that the configuration, which resulted from the rigging of the MCC–36 to the flotilla in this case, should have caused defendant to place lookouts on the tow during the river trip. See, Post-Trial brief, at pp. 11–12; plaintiffs' Proposed Findings of Fact, ¶ 34; and plaintiffs' Proposed Conclusion of Law, ¶ 6, which states:

6. Defendant, in breach of its duty to plaintiff, failed to post a lookout on the tow to advise the pilot of the manner in which the MCC–36 was riding.

While we entertain some doubt as to whether the failure to post a lookout on the

tow would constitute a breach of defendant's duty under the circumstances of this case, we need not reach this issue question because plaintiffs have wholly failed to adduce sufficient evidence for this Court to conclude the extent to which lookouts may or may not have been placed. See, Gibson Depo. pp. 43–49. See also, Tr. 300–302, 321–322, Kight Depo. pp. 18, 21–24. Accordingly, we find and conclude that plaintiffs' contention regarding lookouts as suggested in Proposed Conclusion of Law ¶ 6 is untenable and must be rejected.

### Improper Navigation

Plaintiffs' third argument, which concerns the alleged "negligent and imprudent" navigation of the bend at Mile 878, is stated as follows in plaintiffs' Post-Trial Reply brief, at pages 6–7:

> The navigation of the bend as depicted by Captain Anderson, examination of plaintiffs' Exhibit 68 and Court Exhibit No. 1 reveals the captain navigated *outside the channel, moved from slack water into the current at an angle,* thus exposing the head of the tow to currents coming across the bow from the starboard side at the most treacherous point of the river. This maneuver exposed the head of the tow to a current on the starboard side and placed the head of the tow at such a critical point that the unprotected MCC–36 was caused to capsize from taking water over the bow or starboard side. (Emphasis ours).

See also, plaintiffs' Post-Trial brief, at pp. 13–18; plaintiffs' Proposed Conclusions of Law, ¶¶ 8–10, and plaintiffs' "Brief Responding to Defendant's Suggested Findings of Fact and Stating Suggested Findings in Rebuttal," ¶ 55.

Plaintiffs' improper navigation theory is based on the testimony of their expert, Captain Leonard W. Thompson. After examining the documentary evidence and reading the depositions of defendant's employees, Captain Leonard Thompson stated his opinion that:

> My opinion is that the MCC–36 being on the head of the tow, subject to a variation of currents, unprotected, capsized from the standpoint of taking water over the bow or starboard side of the MCC–36 which caused it to list and eventually run under and turn over. [Tr. at 28].

Captain Thompson based his opinion on two essential underlying factual assumptions. First, he assumed that the MCC–36 must have moved from "slack water into the current at angle," and, second, he assumed that the MCC–36 must have been navigated "outside the channel." Captain Thompson conceded that if the evidence established that defendant's Captain "was never in slack water but he was operating against current at all times," that plaintiffs' expert's opinion of the accident would have to "change." (Tr. 43).

After careful examination of all the facts and circumstances, we find and conclude that plaintiffs have failed to adduce sufficient evidence to establish either (a) that the MCC–36 moved from slack water into current at angle, or (b) that the MCC–36 was ever navigated outside of the channel. Other than plaintiffs' expert opinion the only testimony concerning the existence of slack water on the record is defendant's Captain Anderson's unequivocal testimony that he was never in slack water but instead operated against the current at all times. See, Anderson Depo. p. 55. That testimony along with other evidence which we discuss below seriously undermines the value of plaintiffs' expert opinion and requires a finding that the MCC–36 was operating in the channel and against the current before and at the time of the casualty.

The relevant documentary evidence concerning the position of the tow and its navigation at the Marr Towhead Light includes Court Exhibit No. 1, Plaintiffs' Ex. Nos. 4, 19, 66, and 68. Plaintiffs' Exhibits Nos. 4 and 19 are contemporaneous reports made by the captain of defendant's tug shortly after the casualty. Those documents generally indicate that the tug was nearly around, if not completely around, the bend at the time of the accident. In both of those documents defendant's captain clearly used the Marr Towhead Light as his point of reference and thereby located his

tow prior to the accident and at the time of the accident. Location of the Marr Towhead Light as a reference point on Ct. Ex.No. 1, a map of the Lower Mississippi River, and Plaintiffs' Ex.No. 68, a hydrographic survey, convinces this Court that the tug was nearly around, if not completely around, the bend at the time of the accident. This evidence is in sharp contrast to plaintiffs' expert's testimony at trial which placed the tow much further downstream. See, Tr. 40 and the corresponding mark placed on Ct.Ex. # 1 by plaintiffs' expert.

In addition, there was no evidence that there was anything unusual about the channel at the particular point in the river generally opposite and immediately downstream from the Marr Towhead Light. Plaintiffs' expert testimony concerning the alleged condition of the channel and the "treacherous" nature of the bend at Marr Towhead Light is simply not supported in the record. See, particularly, Plaintiffs' Ex.No. 68. See also, Plaintiffs' Ex.No. 66, which is a Coast Guard Notice to Mariners—Channel Report, which contains information dated December 1971. Examination of that report establishes that the Coast Guard gave no special instructions concerning any unusual channel conditions or treacherous water at the Marr Towhead Light bend. The report shows that such instructions were given at numerous other points on the Mississippi River. See, e. g., Report, p. 19, which states under the section entitled "Cracraft Towhead Bar and Correigidor 23 Ft:"

"NOTE: EXTREME CAUTION ADVISED FROM CORREIGIDOR LT. (506.-61b) TO BELOW SARAH ISLAND MIDDLE BAR LOWER LT. (502.4) DUE TO ERRATIC CHANNEL."

Our examination of the record convinces us that it would be impossible to conclude with even a minimal degree of certainty that the MCC–36 either moved from slack water into current or that it had ever been navigated outside of the channel before the casualty occurred.

All of the facts and circumstances require that we reject plaintiffs' proposed findings and that we make express findings that the MCC–36 was always in channel and that it was not and had never been in slack water as it negotiated the Marr Towhead Light bend. Accordingly, we find and conclude that plaintiffs' "improper navigation" theory is without sufficient evidentiary support under the circumstances and must be rejected for the reasons we have stated.

For the reasons stated and in summary, we reject each of plaintiffs' three factual arguments to support their claim of specific negligence or lack of maritime skill. Plaintiffs have not only failed to adduce sufficient evidence to establish any one of the three specific alleged acts; the greater weight of the credible evidence supports our findings in defendant's favor in regard to each of those three issues. Under the well settled principles of admiralty law stated in *Stevens v. The White City* and its progeny, judgment on the question of liability must be entered in favor of defendant and against plaintiffs. Under the factual circumstances as we find them, principles stated in *The Steamer Webb* are not applicable to this case.

For purposes of possible appeal, the additional findings of fact and conclusions of law stated in this part of this memorandum opinion are to be considered as supplementary to the findings of fact and conclusions of law stated in parts I and III, pursuant to Rule 52(a), F.R.Civ.P.

### III.

*Conclusions of Law*

In addition to the conclusions of law heretofore made in this memorandum opinion, we make the following conclusions of law:

1. This Court has jurisdiction over the parties and subject matter pursuant to its admiralty and maritime jurisdiction, 46 U.S.C. § 740; 28 U.S.C. § 1333; and Rule 9(h) of the Federal Rules of Civil Procedure.

2. Plaintiff and defendant entered into a contract of towage for the transportation of the crane barge MCC–36 from Caruthersville, Missouri, to St. Louis, Missouri, by the M/V WALTER STEPHENS COX.

3. Defendant tug was under a duty to the plaintiff tow to exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar services.

4. In a contract of towage, the party offering its vessel for towage (plaintiff herein) warrants that she is sufficiently staunch and strong to withstand the ordinary perils to be encountered on the voyage.

5. Defendant tug was neither a bailee nor an insurer. The doctrine of *res ipsa loquitur* or the principles stated in *The Steamer Webb* are not applicable in this admiralty case. Proof of delivery of a barge in apparent good condition does not make a prima facie case of negligence should it be lost by the tow. Under the circumstances of this case, the tow must prove negligence by specific acts of negligence or proof of a failure to exercise reasonable maritime skill unaided by any presumption of law.

[11] 6. Defendant tug was entitled to assume that the MCC–36 barge to be towed was tendered in a seaworthy condition. The tug was not under duty to make a detailed examination or inspection of the MCC–36 barge nor was it under duty to post a lookout or to maintain constant surveillance of the MCC–36 barge under the circumstances of this case.

7. Plaintiffs failed to adduce sufficient evidence to carry the burden of proving that the loss was caused as a result of defendant's negligence or a failure to exercise reasonable maritime skill. Careful consideration of all the facts and circumstances leaves the cause of the loss of the crane barge MCC–36 in the realm of conjecture and speculation.

8. Accordingly, this Court concludes that plaintiff has failed to sustain the burden of proof on the separated issue of liability imposed by applicable admiralty law. Plaintiffs' complaint must therefore be dismissed with prejudice, at the cost of plaintiff. The Clerk is directed to enter a separate judgment in favor of the defendant and against plaintiff.