522 F.Supp. 842 (1981)
CONSOLIDATED GRAIN AND BARGE COMPANY, Plaintiff,
v.
WISCONSIN BARGE LINE, INC., Defendant.
MARINE EQUIPMENT MANAGEMENT CORPORATION, Intervenor,
v.
CONSOLIDATED GRAIN AND BARGE COMPANY and Wisconsin Barge Line, Inc., Defendants.
No. 79-1059 A(3).
United States District Court, E. D. Missouri, E. D.
June 26, 1981.
Memorandum and Order August 31, 1981.
*843 *844 Gary T. Sacks, Goldstein & Price, Robert Nienhuis, St. Louis, Mo., for Consolidated Grain & Barge Co.
Joseph Murphy, Lucas & Murphy, Donald Balfour, St. Louis, Mo., for Marine Equipment Management Corp.
Michael D. O'Keefe, Thompson & Mitchell, St. Louis, Mo., for Wisconsin Barge Line, Inc.
W. J. Larzelere, Lemle, Kelleher, Kohlmeyer & Matthews, Edward F. Kohnke, New Orleans, La., for defendants.

MEMORANDUM
FILIPPINE, District Judge.
This matter is before the Court for a decision on the merits after trial to the Court, sitting in admiralty. Plaintiff brought this action to recover for damages to its barges, Sharon Rose-24 and Kent-28, alleging breach of defendant's warranty to tow these barges in a safe and workmanlike manner. Defendant denied liability and counterclaimed for damages to its barges, FGD-305, XR-34 and WBL-336B, alleging that the unseaworthiness of plaintiff's barges caused damages to defendant's barges. Defendant also sought indemnity and/or contribution from plaintiff for the claims of any intervenor asserted against defendant. Marine Equipment Management Corporation (Marine) filed an intervening complaint against both plaintiff and defendant to recover for damage to its barge which was being towed along with plaintiff's barges by defendant.
After consideration of the testimony and exhibits introduced at trial, and the parties' stipulations and briefs, the Court hereby makes the following findings of fact and conclusions of law in accordance with Fed. R.Civ.P. 52.

FINDINGS OF FACT
At all relevant times, plaintiff, Consolidated Grain and Barge Company (Consolidated), was a corporation duly organized and existing under law. Plaintiff was the owner pro hac vice of the barges Sharon Rose-24 and Kent-28.
At all relevant times, defendant, Wisconsin Barge Line, Inc. (Wisconsin), was a corporation duly organized and existing under law. Defendant was the owner and operator of the M/V MARIE HENDRICK and M/V CRIMSON GEM, both of which were river towboats designed for the use of transporting barges on the Mississippi River.
At all relevant times, intervening plaintiff, Marine, was a corporation duly organized and existing under law. Marine was the owner pro hac vice of Barge RR-209B.
Barges Sharon Rose-24 and Kent-28 were unmanned, unpowered, covered, steel-hulled hopper barges built in 1974 and were 200" long, 35" wide and 12" deep. Both barges contained a raked bow and a square stern.
Barge RR-209B was an unmanned, unpowered, covered, steel-hulled hopper barge whose dimensions were 200' long, 35' wide and 12' deep. She had a square bow and a square stern.
The XR-34, FGD-305 and WBL-336 barges were owned by Wisconsin and were 200' long, 35' wide and 12' deep.
All of the barges were double-hulled and contained a number of void compartments on their sides and a rake and stern compartment.
Consolidated was the bailee of the cargo contained in Barge Sharon Rose-24, which was 56,632 bushels of No. 3 yellow corn, loaded into the barge on April 9, 1979 at Ottawa, Illinois.
The M/V CRIMSON GEM was 195' long, 54' wide and 9.6' deep. She was equipped with three diesel engines each of which were rated at 2,800 horsepower for a total of 8,400 horsepower. Her steering system included three steering and six flanking rudders. She was further equipped with radar, VHF radios and a fathometer to determine the depth of the water.
At the time of the casualty involved in this lawsuit, Wisconsin was transporting Barges Sharon Rose-24 and Kent-28 from *845 St. Louis, Missouri to New Orleans, Louisiana pursuant to the terms of a written towing agreement executed by and on behalf of Wisconsin and Consolidated, the terms of which required Wisconsin to tow the barges "in a conscientious and prudent manner."
At the time of the casualty involved in this lawsuit, Wisconsin was transporting Barge RR-209B from St. Louis, Missouri to New Orleans, Louisiana.
On May 24, 1979, at about Mile 37 on the Upper Mississippi River, the M/V CRIMSON GEM exchanged tows with the M/V MARIE HENDRICK. As a result of this tow exchange, Barges Sharon Rose-24 and Kent-28 and RR-209B were moved from the tow of the M/V MARIE HENDRICK and placed in tow of the M/V CRIMSON GEM to complete the trip to New Orleans.
At the time of the tow exchange, the crew members of the M/V CRIMSON GEM and the M/V MARIE HENDRICK inspected the barges in tow, including the Sharon Rose-24 and Kent-28. The crew of the M/V MARIE HENDRICK had earlier that morning discovered water in the bow compartment of the Sharon Rose. The crew had pumped out the water and shingled a crack discovered in the bow rake of the Sharon Rose. The crack was approximately 1 foot long and three-quarters of an inch wide. It was located four feet below the deck and two feet above the river level. Shingling stopped the leak. The crew of the M/V CRIMSON GEM was informed of the shingling. The Sharon Rose-24 remained at the head of the tow because she was no longer leaking. The captain's mate was directed to "keep an eye on" the barge.
From the time the two barges were placed in the tow of the M/V CRIMSON GEM until the time of the casualty, all of the barges were checked once every six hours. The crew members opened the hatches and looked for water. Plaintiff's barges were not leaking. The shingle in the crack of the Sharon Rose was in tight. The last check was made at midnight on May 26, 1979. Before the casualty, there were no groundings, strandings, or other incidents which could have damaged the Sharon Rose-24 or Kent-28. The pilot of the M/V CRIMSON GEM did not experience any problems with any of the barges which affected navigation.
The rigging of the tow was composed of used cables one inch in diameter. The rigging was checked every six hours. The last check was at midnight on May 26. The rigging was tight. At the time of the casualty, there was excess rigging on the two outside strings of the tow and across the head of the tow, which had been put on 100 miles above Mile 665 for the narrow passage through Gold Dust.
At the time of the casualty, about 4:30 a. m. on May 26, 1979, the M/V CRIMSON GEM was proceeding downbound at about Mile 665 on the lower Mississippi River with a tow of 35 barges, made up 5 long and 7 wide. The tow was approximately 1,000' long and 245' wide. With the added length of the towboat, the flotilla was 1,195' long and 245' wide. Kent-28 was at the head of the tow on the extreme starboard side. Sharon Rose-24 was the lead barge of the second most starboard string. It was being towed bow downstream. The weather, visibility, and river conditions were good. There is no credible evidence that an eddy had formed in this area of the river at this time.
At the time of the casualty, the navigation channel in the area of Mile 665 was delineated by a number of black buoys which represented the right descending edge of the channel. The depth of the water within the marked navigation channel in that area was at least 20 feet. The nearest gauge reading reported a river stage of 28.1', at Helena, Arkansas.
Just above Mile 665, the lower Mississippi River bends to the right for downbound vessels. Sometime near 4:00 a. m. on May 26, 1979, the pilot on watch, Raymond Webb, prepared to negotiate the bend through the restricted channel area known as Flower Lake Bar. He positioned his tow so that the head of the tow pointed toward the left descending side of the river while his stern was out toward the buoy line, and *846 he rounded the bend in a flanking maneuver, which means that he slowed down and floated around the bend with the current. The Robert Crown was on the left waiting for the M/V CRIMSON GEM to pass. Pilot Webb was staying to the right, watching the buoys on the right with the aid of search lights which he was operating. He was operating without a lookout. The river was running five miles per hour, and the tug's engines were in reverse.
When a tow is coming out of the flanking maneuver at Flower Lake Bar, the current is rapidly carrying the head of the tow toward the right descending side. To avoid the tow's being swept outside the channel, the pilot must "pull the trigger", i. e., place the throttles full ahead at the proper time. If the throttles are not placed full ahead at the proper moment, overflanking occurs. Overflanking results in going from the channel onto the right descending sandbar. After Pilot Webb completed the flank at about 4:30 a. m., he came ahead on his engines. Two to three minutes after he came ahead on his engines, Pilot Webb saw the head of the tow begin to break apart. The Court finds from the credible evidence that, at that time, his speed was approximately eight miles per hour (five miles per hour from the river current plus three miles per hour from the vessel's pushing), a speed which was not excessive. The depth of the water within the channel at the point where the casualty occurred was at least twenty feet. The tug and the barges drew a little over eight feet. The channel was 1,000 feet wide.
When the tow broke apart, the Kent-28 drifted toward the starboard channel. The Sharon Rose-24 came out of tow behind the Kent-28 listing and sank "like a rock" within two minutes or so two hundred feet outside the channel. The FGD-305 also came out of tow and was struck by the WBL-336B and RR-209B, which were still part of the intact portion of the tow. When the tow broke apart, the Kent-28, RR-209B, XR-34 and WBL-336 were damaged, and the FGD-305 sank.
William Kellum, a marine surveyor who examined the Sharon Rose-24 after the casualty, found a hole in her bottom measuring one foot by four feet, which, in his expert opinion, was the result of grounding damage caused by hitting a hard sharp object at a force of more than five miles per hour on a free drift. This hole was located ten feet away from the area of the shingled crack.
There was conflicting testimony from those on board the tug as to whether there was a grounding of the tow, and, if there was, whether the tow was outside the channel when any such grounding occurred. The Court finds from a preponderance of the credible evidence that when Pilot Webb pulled the trigger, he overflanked, thus causing his tow to leave the channel; the Sharon Rose-24 to strike an object outside the channel, suffer a hole in her bottom and sink; and the Kent-28 and the RR-209B to be damaged when the tow broke apart as a result of the grounding. There is no credible evidence that the rigging of the tow was improper or that inspection of the rigging was faulty.[1] The logical inference is that the rigging broke as a result of the grounding.
The Court finds that the failure to post a lookout was not a proximate cause of the casualty.
The Court finds that, prior to the casualty, the Sharon Rose-24, the Kent-28, and the RR-209B were seaworthy barges, i. e., reasonably ready and fit to be towed on the Mississippi River in a normal manner and that the grounding and breaking away of the barges in tow did not result from any fault of the above-named barges.
*847 As a result of the casualty, plaintiff sustained damage in the amount of $431,691.87. Raising and repairing the Sharon Rose-24, repairing the Kent-28, loss of cargo in the Sharon Rose-24, switching, surveying, drydocking, and other miscellaneous expenses amounted to $375,590.45. Of this amount, $340,326.06 is attributable to the Sharon Rose-24 and $35,264.39 to the Kent-28. Loss of use of the Sharon Rose-24 cost plaintiff $46,301.28; loss of use of the Kent-28 cost plaintiff $9,800.14. These amounts are based on the fair and reasonable cost of purchasing substitutes to fill the commitments of the two barges minus expenses saved.
As a result of the casualty, Marine sustained damage in the total amount of $56,440.55. Towing, repairing, shifting, and other miscellaneous charges incurred in conjunction with the repair of the RR-209B amounted to $53,594.20. Loss of use of the barge for 29 days at $98.15 per day amounted to $2,846.35.

CONCLUSIONS OF LAW
This Court has jurisdiction over this controversy pursuant to its admiralty and maritime jurisdiction. 28 U.S.C. § 1333; Fed.R. Civ.P. 9(h).
A tug is not liable as an insurer or as a common carrier. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699 (1932); Mid-America Transportation Co. v. National Marine Service, Inc., 497 F.2d 776, 779 (8th Cir. 1974), cert. denied 425 U.S. 937, 96 S.Ct. 1671, 48 L.Ed.2d 179 (1976). The tug owes a duty to its tow to exercise reasonable care and that degree of maritime skill that prudent navigators employ in performing similar services. Stevens, supra, 285 U.S. at 202, 52 S.Ct. at 349; National Marine, supra. The burden of proving negligence is on the party asserting it. Stevens, supra; National Marine, supra. A tug's receipt of a tow in good order and delivery in damaged condition raises no presumption of negligence. Stevens, supra; South, Inc. v. Moran Towing and Transportation Co., 360 F.2d 1002, 1005 (2d Cir. 1966); Massman Construction Co. v. Sioux City & New Orleans Barge Lines, 462 F.Supp. 1362 (W.D.Mo.1979). However, under certain circumstances, the tug may be required to show a reasonable explanation for a casualty. National Marine, supra. Such is the case when a barge grounds outside the channel, raising a presumption that the tug was negligent. The Steamer Webb, 81 U.S. (14 Wall) 406, 20 L.Ed. 774 (1872); National Marine, supra; Humble Oil & Refining Co. v. Tug Crochet, 422 F.2d 602 (5th Cir. 1970). Bisso v. Waterways Transportation Co., 235 F.2d 741 (5th Cir. 1956); The Anaconda, 164 F.2d 224 (4th Cir. 1947); Mid-America Transportation Co. v. Rose Barge Lines, Inc., 347 F.Supp. 566 (E.D.Mo.1972), modified 477 F.2d 914 (8th Cir. 1973). The credible evidence in this case established a grounding of the Sharon Rose-24 outside the channel caused by negligent navigation, i. e., overflanking by the pilot of the tug. Plaintiff and Marine have carried their burden of proof. Defendant has not rebutted the inference of negligence.
This negligent navigation was the proximate cause of the sinking of the Sharon Rose-24 and of the damage to the Sharon Rose-24, the Kent-28 and the RR-209B sustained when the tow broke up upon the grounding of the Sharon Rose-24.
Plaintiff would have this Court find an additional cause of this accident in defendant's failure to post a lookout. Plaintiff contends that failure to post a lookout is a statutory violation. See 33 U.S.C. § 351. When a ship, at the time of a collision, is in violation of a statutory rule intended to prevent collisions, a presumption arises that the violation was a contributory cause of the disaster. The Pennsylvania, 86 U.S. (19 Wall) 125, 22 L.Ed. 148 (1874). The burden is upon the ship to show that the fault could not have been a cause. Id.; Ira S. Bushey & Sons, Inc. v. U. S., 172 F.2d 447 (2d Cir. 1949). While a ship may be negligent in failing to post a proper lookout, it is not held liable when what the lookout would have learned was already known. Ellis Towing & Transportation Co. v. Socony Mobil Oil Co., 292 F.2d 91, 96 (5th *848 Cir. 1961). In the instant case, the pilot could see the black buoys in his searchlight. When to "pull the trigger" is a matter of judgment. There is no indication that the lookout would have seen anything that the pilot did not that would have improved the pilot's judgment. Therefore, even if defendant was negligent in failing to post a lookout, defendant has carried its burden of showing that failure to post a lookout could not have caused the accident. Defendant is not liable for failure to post a lookout.
Plaintiff did not breach its warranty to tender seaworthy barges. A barge is seaworthy if it is sufficiently staunch and strong to withstand the ordinary perils of a voyage when towed in a normal manner. Moran Towing, supra at 1005; Massman Construction, supra at 1368. The barge need not be perfect; it need only be reasonably fit for towage in a normal manner. Tidewater Marine Activities, Inc. v. American Towing Co., 437 F.2d 124, 128, 130 (5th Cir. 1970); S. C. Loveland, Inc. v. East West Towing, Inc., 415 F.Supp. 596, 605 (S.D.Fla. 1976), aff'd 608 F.2d 160 (5th Cir. 1979). Defendant makes much of the shingled crack in the bow of the Sharon Rose-24, but the uncontroverted testimony is that the barge was allowed to remain at the head of the tow when it was picked up from the M/V MARIE HENDRICK because it was no longer leaking, that it was towed over four hundred miles by the M/V CRIMSON GEM without incident prior to the casualty, that during that time it took on no water, and that the crack did not widen into the huge hole found in the barge's bottom. Furthermore, defendant cannot benefit from the presumption of unseaworthiness which occurs where a vessel is lost under normal conditions in the absence of proof of improper handling[2] because here there is proof of improper handling.
The parties stipulated the amount of damages except for loss of use of the Sharon Rose-24 and the Kent-28. The settled rule in admiralty is that the owners of an injured vessel are entitled to recover for the loss of her use while she is laid up for repairs. Mid-American Transportation Co. v. Cargo Carriers, Inc., 480 F.2d 1071, 1073 (8th Cir. 1973). This rule applies so long as profits are actually lost and the amount of lost profits is proven with reasonable certainty. Id. The cost of hiring a substitute vessel is a proper measure of lost profits. Sinclair Refining Co. v. The American Sun, 188 F.2d 64 (2d Cir. 1951); The Glendola, 47 F.2d 206 (2d Cir. 1931). In no case is more than the net profits recoverable. Cargo Carriers, supra. Plaintiff has proven its lost profits with reasonable certainty by showing the necessity of hiring substitute barges and by proving the fair and reasonable cost of hiring substitute barges to fulfill the commitments of the two damaged barges. Plaintiff has deducted from this cost the amounts saved by not using its own barges. Thus, it is claiming only net profits.
The Court finds that as a result of defendant's negligent navigation, plaintiff is entitled to judgment on its claim against defendant in the amount of $431,691.87 plus prejudgment interest on the $340,326.06 spent in connection with repairs on the Sharon Rose-24 from December 13, 1979 and prejudgment interest on the $35,264.39 spent in connection with repairs on the Kent-28 from June 29, 1979.[3]
The Court finds that as a result of defendant's negligent navigation, Marine is entitled to judgment against defendant in the amount of $36,440.55 plus prejudgment interest from June 22, 1979 on the $53,594.20 of this amount spent in connection with repairs.
*849 In admiralty, prejudgment interest is to be awarded at a rate in keeping with the interest rates prevailing at the time repairs were completed. Cargill, Inc. v. Taylor Towing Service, Inc., 642 F.2d 239 (8th Cir. 1981); United States v. M/V Gopher State, 614 F.2d 1186 (8th Cir. 1980). In awarding this prejudgment interest, a court need not be limited by the legal rate in the forum state. Cargill, supra; Federal Barge Lines, Inc. v. Republic Marine, Inc., 616 F.2d 372 (8th Cir. 1980); Gopher State, supra. Taking judicial notice of the cost of borrowing money at the relevant times, the Court concludes that prejudgment interest should be awarded at the rate of 10% per annum.
Because there is no evidence of unseaworthiness of plaintiff's barges, defendant's counterclaim against plaintiff and Marine's claim against plaintiff will be dismissed, and judgment will be entered for plaintiff on both of these claims.

MEMORANDUM AND ORDER
This matter is before the Court on the motion of defendant, Wisconsin Barge Line, Inc., for a new trial or, in the alternative, to amend the judgment entered on June 26, 1981 and to direct the entry of a new judgment dismissing the plaintiff's complaint. For the reasons stated below, defendant's motion will be denied.
Defendant complains of an inconsistency in the Court's findings as to whether the Sharon Rose grounded while in tow or while on a free drift. The source of this apparent inconsistency is the sentence in the second full paragraph on page six of the Court's Memorandum filed June 26, 1981 which reads: "William Kellum, a marine surveyor who examined the Sharon Rose-24 after the casualty, found a hole in her bottom measuring one foot by four feet, which, in his expert opinion, was the result of grounding damage caused by hitting a hard sharp object at a force of more than five miles per hour on a free drift."
Defendant concludes that this sentence means that William Kellum's opinion was that the grounding damage was a consequence of a collision "on a free drift." This was not William Kellum's opinion. The source of the confusion is the structure of the Court's sentence, and the Court apologizes for the confusion which the sentence has caused.
William Kellum's testimony was that the hole was caused by a grounding, which occurred while the barge was travelling at a speed greater than five miles per hour. Five miles per hour is the speed at which the Sharon Rose-24 would have been travelling if she had been on a free drift as five miles per hour was the speed of the river current. William Kellum stated that the hole could not have been inflicted while the ship was on a free drift at a speed of five miles per hour. What the Court was trying to say in the sentence on page six is that the damage was caused by hitting a hard sharp object at a force of more than five miles per hour, the speed of free drift, and thus could not have been incurred while on a free drift. To clarify its finding, the Court will order the words "on a free drift" stricken from its opinion.
Defendant also complains that the "plaintiffs have failed to come forward with proof sufficient to establish that the tow ... broke apart as a result of the fault of Wisconsin Barge Line, Inc. Defendant points to the eyewitness testimony of Pilot Webb, Mate Gary Thornberry, and Captain Clarkson, which it believes indicates that the tow was within the navigable channel when the head of the tow broke apart. Both Pilot Webb and Mate Thornberry did testify that the tug was in the channel at the time of and immediately after the accident. However, deckhand Waldron testified that the tug was outside the channel. Furthermore, Captain Clarkson testified that the Sharon Rose-24 was sinking 75 feet to the starboard side of the tug. Since the Sharon Rose-24 sunk 200 feet outside the channel, the tug would have been outside the channel, also. Both deckhands who testified, Waldron and Hedges, stated that they felt a jolt which felt like that experienced on previous groundings. Taking the eyewitness testimony together with that of *850 William Kellum, the marine surveyor, there is a preponderance of credible evidence from which the Court still concludes that there was a grounding of the tow outside of the channel. Accordingly,
IT IS HEREBY ORDERED that the words "on a free drift" in the sentence "William Kellum, a marine surveyor who examined the Sharon Rose-24 after the casualty, found a hole in her bottom measuring one foot by four feet, which, in his expert opinion, was the result of grounding damage caused by hitting a hard sharp object at a force of more than five miles per hour on a free drift" in the second full paragraph on page six of the Court's Memorandum filed June 26, 1981 be and are VACATED.
IT IS FURTHER ORDERED that the motion of defendant, Wisconsin Barge Line, Inc., for a new trial or, in the alternative, to amend the judgment entered on June 26, 1981 and to direct the entry of a new judgment dismissing the plaintiff's complaint be and is DENIED.
NOTES
[1] The Court finds the Coast Guard report of little probative value. Lt. Conklin, who prepared the report, found the proximate cause of the casualty to be improper rigging, which broke when the tow hit an eddy and dove. At the time of the accident, Lt. Conklin had only recently received his commission. He had no experience on the Mississippi River himself. He interviewed only Pilot Webb. On the basis of this interview, he had eliminated the possibility of a grounding. He did not have the benefit of William Kellum's report. He accepted the suggestion of his superior, Cmdr. Cole, that if the tow broke apart with no other explanation, there must have been improper rigging.
[2] See, Massman, supra at 1369; Derby Company, Ltd. v. A. L. Mechling Barge Lines, Inc., 258 F.Supp. 206 (E.D.La.1966), aff'd 399 F.2d 304 (5th Cir. 1968).
[3] In admiralty cases, prejudgment interest is to be awarded unless there are exceptional or peculiar circumstances. Mid-America Transportation Co. v. Rose Barge Line, Inc., 477 F.2d 914 (8th Cir. 1973). There are no such circumstances in this case. Prejudgment interest is not awarded for loss of use. Id.