556 F.Supp. 87 (1982)
The OHIO RIVER COMPANY, Plaintiff,
v.
PEAVEY COMPANY, in personam, and the M/V Gremco, her engines, tackle, etc., in rem, Defendant.
No. 80-376A(1).
United States District Court, E.D. Missouri, E.D.
December 28, 1982.
*88 Raymond L. Massey, Thompson & Mitchell, St. Louis, Mo., for plaintiff.
Gary T. Sacks, Goldstein & Price, St. Louis, Mo., for defendant.

MEMORANDUM
WANGELIN, Chief Judge.
This matter is before the Court for a decision after a trial on the merits during December 15-17, 1981. Since this is an admiralty case and within the Court's maritime jurisdiction under Rule 9(h) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1333, the Court heard the evidence without a jury. After considering the pleadings, testimony of the witnesses, stipulations of the parties and the various memoranda submitted on behalf of the respective parties, the Court makes the following findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure. Any finding of fact equally applicable as a conclusion of law is adopted as such and, conversely, any conclusion of law applicable as a finding of fact is adopted as such.

*89 Findings of Fact

1. Plaintiff in this action is The Ohio River Company (hereinafter Ohio), a West Virginia Corporation engaged in the business of river transportation and at all times relevant herein was the bareboat charterer and owner pro hoc vice of barges OR-3412, OR-225, OR-3830 and OR-3548.
2. Defendant is the Peavey Company (hereinafter Peavey), a corporation engaged in the river towboat business and at all times relevant herein was the charterer and operator of the M/V Gremco and Barge PV-2519.
3. The M/V Gremco is a river towboat, one hundred and forty feet long and forty five feet wide, with three engines, sixteen hundred HP each, with three steering rudders and six flanking rudders and was built in 1971.
4. In the early morning hours of January 7, 1979, four Ohio River barges (OR-3412, OR-225, OR-3830 and OR-3548) were moored and stationary at the Union Electric fleet at or about mile 161 on the upper Mississippi River. The barges had been delivered to that facility the preceding night. Barges OR-3548 and OR-3830 were empty barges tied off in the Union Electric fleet downstream from where loaded barges OR-3412 (which was loaded with approximately one thousand four hundred and sixty seven tons of coal) and OR-225 were tied. Said loading barges would have been unloaded and its buoyancy compartments pumped within a day of arrival. Barge OR-3412 was faced with its raked bow upriver. Directly behind OR-3412 was OR-225.
5. At approximately 5:30 a.m., January 7, 1979, defendant's river towboat, the M/V Gremco, was proceeding downstream through St. Louis harbor with a towage of four barges when its rudders became jammed due to heavy flowing ice in the river. The pilot, Captain Billy Wayne Moore, reversed the Gremco's engines in an attempt to slow the boat and tow down, but the force of the river carried the M/V Gremco and tow downstream into the Union Electric dock. The bow of the M/V Gremco's lead starboard barge PV-2519, whose rake in was pointing downriver, struck the bow of OR-3412, inflicting cracks in the bow rake compartment of OR-3412 and plaintiff's PV-2519. Peavey admits liability for the collision. After the collision, OR-3412 broke loose and floated downriver until it was retrieved by the M/V St. Genevieve. OR-3412 did not come in contact with anything after the collision and before the St. Genevieve picked it up. OR-3412 was then shoved under a dike area to protect the barge from heavy flowing ice and the river current. The steep bank of the Missouri River just under the dike negated any possibility of beaching OR-3412 at the dike and the barge's damaged condition obviated any chance of moving the barge one-half mile across the river to a sandbar.
6. Once OR-3412 had been pushed into the dike area, the crew of the St. Genevieve and the M/V Gremco began pumping the barge's compartments. While pumping OR-3412 the Captain of the Gremco attempted to acquire a crane barge to remove OR-3412's coal. The captain also inquired into whether Union Electric would allow him to move the barge to the Union Electric facility for unloading. These attempts were in vain. It was discovered that, although the M/V Gremco had caused damage only to OR-3412's rake compartment, the number three and number four buoyancy compartments of OR-3412 contained substantial amounts of water. Most of the water in the number three and number four compartments was eventually pumped out, however, the bow of OR-3412 kept settling lower in the water because substantial amounts of water had seeped in through preexisting fractures into the barge's hopper compartment. The frozen coal in the hopper made efforts to pump the hopper impossible. By 11:40 a.m., January 7, 1979, enough water had shifted forward into the hopper so that the barge sank thirty to fifty feet offshore in about thirty to fifty feet of water. The crews of the M/V Gremco and the M/V St. Genevieve had done everything possible to prevent the barge from sinking after the collision.
*90 7. OR-3412 is a fifteen year old double skinned river barge. OR-3412 was constructed with an outer skin of steel and an inner skin of steel divided by six separate bouyancy compartments designed to be water tight. The theory behind double skinned barges is that if water enters any of the compartments or the bottom of the barge from a tear in the outer layer of the barge, it will not sink unless the water tight integrity between the various weight water tight compartments, which are separated by a series of steel bulkheads, has been violated. Of course, it is common knowledge that all barges on the river, even new ones, usually contain some amount of water in the various "water tight compartments". The water tight compartments surround an open cargo hopper.
8. Defendant's evidence established that OR-3412 contained preexisting fractures which breached the water tight integrity of the barge. The gash in OR-3412's bow rake compartment caused by the collision did not result in the fractures in the number three and number four bouyancy compartments and in the hopper compartment that permitted water to flow into these areas. A ruptured bow rake compartment normally will not, in and of itself, cause a barge to sink.
9. It is undisputed that, absent the collision with the M/V Gremco, OR-3412 would have remained afloat without pumping for at least thirty days. Moreover, had OR-3412 been pumped, which it would have been by the crew at the Union Electric facility, it would have stayed afloat indefinitely.
10. The parties tendered several witnesses who testified as to the freeboard (the distance from the water up to the deck of the barge) of OR-3412 before the collision. Normally, a barge with the cargo load of OR-3412 should have at least three feet of freeboard. Deckhand Charles Liley of the M/V St. Genevieve testified that shortly after midnight on January 7, 1979, the M/V St. Genevieve pulled alongside the barges at the Union Electric facility and that he physically inspected OR-3412 and found the barge's number three and number four wingtanks at river level and therefore flooded. Mr. Liley also discovered that OR-3412 had a foot or less of freeboard, yet, Liley noted that OR-3412 was sitting flat in the water without any list. Although Mr. Liley found the wing tanks flooded, he did not pump the flooded compartments. Mr. Liley is an employee of Norman Bros. who do extensive work for defendant. The Court does not place much credence in Mr. Liley's recollection for the following reasons: (1) Mr. Liley testified that his boat, the M/V St. Genevieve, left its location to inspect the barge, however, the log of the M/V St. Genevieve, which normally reflects all movements of the boat, reflected no movement notation; (2) If a number three and number four bouyancy compartments of OR-3412 were flooded, then surely the boat would reflect this by listing to the stern. Liley testified that the barge was flat in the water; (3) Although other deckhands were supposedly with Liley during his investigation of OR-3412, none were procured for corroboration.
11. Defendant also produced Billy Wayne Moore, the Captain of the M/V Gremco at the time of the collision. Moore testified that OR-3412 had about one foot of freeboard before the collision. Moore's observation occurred about five hundred feet from the Union Electric facility as Moore was attempting to reverse his tug's engines and avoid a collision. Captain Moore later testified that he could not judge OR-3412's freeboard to be a foot, rather it was his opinion that "the barge was lower in the water than the other barge (other Ohio River barges in the fleet)". TR at 290. The Court has difficulty believing that Moore could discern the exact height of freeboard of OR-3412 because he made the observation from some five hundred feet, in the dark, and while trying to avoid flowing river ice. Rather, the Court finds that Moore observed OR-3412 to have a lower freeboard than its sister barges. Pictures of the damaged barges indicate that OR-3412 was lower in the water than PV-2519, but do not conclusively establish how much lower OR-3412 *91 sat. This finding is further corroborated by the testimony of Captain Winston Boyd, who had delivered OR-3412 to the Union Electric facility. Boyd testified that if OR-3412 had flooded number three and number four wing tanks and, consequently, a one foot freeboard then:
"the barge would have been so low you couldn't face up to it. If I faced up to the bow end of it, I would have shoved it under, if that would have been the case. It couldn't have had any water in those wing tanks." TR at 393.
OR-3412 was not listing according to Boyd. Mr. Boyd did not testify as to the specific freeboard of OR-3412 before the collision. The Court finds that some water entered OR-3412's number three and number four buoyancy tanks as a result of pre-existing fractures, however, there was an insufficient amount of water to sink the barge. Furthermore, the Court finds that OR-3412 was suited for the purpose to which she was used to transport coal and that OR-3412 was strong enough to withstand the ordinary perils of its mission. Indeed, OR-3412 had accomplished her mission at the time of the collision.
12. A fair and reasonable amount for salvaging OR-3412, as stipulated by the parties, is Forty Eight Thousand Seven Hundred and Sixty Seven Dollars and Seventy Eight Cents ($48,767.78). Survey expenses in the amount of Three Hundred and Fifty Two Dollars and Eighty Six Cents ($352.86), paid by plaintiff for services rendered by Marine Loss Control, were fair and reasonable and necessarily incurred as a result of the accident with respect to OR-3412. Survey charges in the amount of Six Hundred and Fifty Two Dollars and Sixty Five Cents ($652.65) which related to salvage efforts were also reasonable and necessary to raise OR-3412. Eleven Thousand Seven Hundred and Seventy Two Dollars and Sixteen Cents ($11,772.16) was reasonably spent on hull damage of OR-3412.
13. It has been stipulated that Seven Hundred and Six Dollars and Fifty Six Cents ($706.56) was a reasonable figure to spend on drydocking and surveying in connection with OR-225. Plaintiff received an estimate in the amount of Nine Thousand Five Hundred Dollars ($9,500) from Louisiana Dock Company to repair the barge's hull. The Louisiana Dock Company actually submitted a bill in the amount of Twelve Thousand and Five Dollars ($12,005) with the amount above the estimate representing extra steel needed to complete repairs. Defendant stipulated that J.C. Gee of Louisiana Dock Company would have testified that the additional steel was necessary to effect repairs on OR-225. Defendant did not controvert the gist of Mr. Gee's proffered testimony. Plaintiff did not send a surveyor to Louisiana Dock Company to determine whether the amount above the estimate was necessary to repair the vessel. The final bill in the amount of Twelve Thousand and Five Dollars ($12,005.00) was reasonable and represented necessary repairs.
14. Plaintiff has admitted liability in the amount of One Hundred and Thirty Six Dollars and Eighty Three Cents ($136.83), paid by plaintiff, for survey services rendered by Marine Loss Control in connection with OR-3548. Further repair expenses in the amount of Five Hundred and Seventy Three Dollars and Fifty Nine Cents ($573.59) paid by plaintiff were fair and reasonable. The Court believes the second survey of OR-3548 was repetitive and unnecessary.
15. With respect to OR-3830, survey costs in the amount of Three Hundred and Thirty Six Dollars and Eighty Three Cents ($336.83) were reasonable and necessary. Credible evidence established that repair costs in the amount of Three Thousand Dollars ($3,000) were reasonable and an additional expense in the amount of Six Hundred Dollars ($600) would have been incurred in shifting the barge to and from the shipyard.
16. Jerry Bockelman, former manager of profit analysis of The Ohio River Company, testified that he had thoroughly reviewed the records of plaintiff's fifteen hundred barges and had determined a net profitability for the four damaged barges. Mr. Bockelman's calculations were based on *92 the concept of "average fleet" which takes the revenue for a particular barge and subtracts the variable expenses which would be incurred only if the barge were operating. The figure arrived at for loss of use was One Hundred and Forty Two Dollars ($142.00) per day for each of the four barges for a total of Seventeen Thousand One Hundred Eighty Two Dollars ($17,182.00). These calculations were based on past profits for The Ohio River Company.
17. On cross examination, defendant established that Mr. Bockelman's testimony was drawn from the Company's records of each barge's logs. These records were apparently physically located in plaintiff's files and were not produced at trial. Furthermore, these records were never delivered to the Court so that a synopsis of them could have been made. Mr. Bockelman did not have firsthand knowledge that the four barges in question would have been under a contract to tow. Nor did Bockelman have firsthand knowledge of the profitability of each barge. The records indicating the actual number of barges in use, and whether there were future contracts of towage for these barges, were never produced even though defendant filed a written discovery request encompassing these records.

Conclusions of Law
Peavey has admitted liability for the collision, therefore, the only matter left open for the Court is the amount of damages to which plaintiff is entitled. Defendant admits that all four of plaintiff's barges were damaged to some degree.
The key issue raised by this lawsuit is whether a barge owner owes the owner of another vessel the duty to provide a seaworthy barge even though no contract of towage exists between the two. Defendant cites a number of cases which purportedly hold that such a duty exists, however, upon closer inspection, it is apparent that these cases are clearly distinguishable from the case at bar. In the cases cited by defendant, the loss complained of arose out of a towage contract. See e.g., Nat G. Harrison Overseas Corp. v. America Tug Titan, 516 F.2d 89, 92 (5th Cir.1975); Mid-America Tramp Co. v. Gladders Towing Co., 492 F.Supp. 475, 478 (E.D.Mo.1980); Ohio River Co. v. M/V Irene Chotin, 238 F.Supp. 114, 115 (E.D.La.1965); A.S. Wikstrom, Inc. v. Julia C. Moran, 190 F.Supp. 250, 251 (S.D.N.Y.1960). The general rule announced in these cases is that "the master of a tug is entitled to assume that a vessel offered for towage will be `... sufficiently strong and staunch to withstand the ordinary perils to be encountered on the voyage'". A.S. Wikstrom, Inc. v. Julia C. Moran, supra.
The Court has no qualms with the above general statement for once a contract exists between two vessel owners, the barge owner should have a "duty to deliver a seaworthy barge and the (tug) right to rely on the (barge owner) to fulfill that duty." Mid-America Tramp Co. v. Gladders Towing Co., supra. The same rule does not apply with equal force when, as in the case at bar, the actor's negligence harms a party who has no contractual connection with the negligent party. There is no reliance interest to be protected and, therefore, the maxims of the law of torts must come to the forefront. Specifically, the Court believes that the following principle must be controlling: "the negligent actor must bear the risks that his liability will be increased by reason of the actual physical condition of the other to whom his act is negligent." Restatement of Torts, Second § 461 comment A; see Alcoa Steamship Co. v. Charles Ferran & Co., 383 F.2d 46, 54 (5th Cir.1967). The rule of law applicable to the case at bar is that a tortfeasor takes his victim as he finds him.
Defendant has admitted and the Court finds that its vessel negligently collided with plaintiff's barges. But for the collision, the barges, particularly OR-3412, would have remained afloat indefinitely. Although there was credible evidence which showed that OR-3412's freeboard was at a lower than normal level, the ship's preexisting condition was not the proximate cause of its sinking. See E.I. duPont de nemours & Co. v. Riverway Harbor Service of St. Louis, Inc., et al., 485 F.Supp. 180 (E.D.Mo. 1979), aff'd, 639 F.2d 404 (8th Cir.1980). On the facts presented, plaintiff owed defendant no legal duty to furnish a seaworthy barge. Moreover, defendant was unable to *93 conclusively establish that the barge was not "reasonably fit to carry the cargo she ha(d) undertaken to transport". The Southwark, 191 U.S. 1, 9, 24 S.Ct. 1, 3, 48 L.Ed. 65 (1903); see also, Dupont de Nemours & Co. v. Vance, et al., 60 U.S. (19 How.) 162, 15 L.Ed. 584 (1856). A tortfeasor takes his victim as he finds him, consequently, defendant is liable for the damage to plaintiff's barges and for the salvage costs incurred as a result of a collision.
Plaintiff is entitled to recover the costs of salvaging and repairing its barges. See Hewlett v. Barge Bertie, 418 F.2d 654 (4th Cir.) cert. denied, 397 U.S. 1021, 90 S.Ct. 1261, 25 L.Ed.2d 531 (1969).
Damages for loss of use and detention are recoverable in admiralty. See Pan American Petroleum and Transport, Inc. v. U.S., 27 F.2d 684, 685 (2nd Cir.1926). Damages for loss of use are gross profits minus expenses saved by having the vessel out of operation. Complaint of M/V Vulcan, 553 F.2d 489 (5th Cir.1977); Algonquin Deep Sea Research Corp. v. Perini Corp., 353 F.Supp. 561 (D.Mass.1973). Plaintiff is entitled to recover income lost as a result of the collision where the loss can be ascertained with reasonable certainty. Mid-America Transportation Co. v. Cargo Carriers, Inc., 480 F.2d 1071, 1073 (8th Cir.1973); Delta Marine Drilling Co. v. M/V Baroid Ranger, 454 F.2d 128, 130 (5th Cir.1972). Of course, plaintiff bears the burden of establishing all elements of recoverable damages. The Potomac, 105 U.S. 630, 631-32, 26 L.Ed. 1194 (1881).
To warrant recovery for lost profits, "the plaintiff must present proof sufficient to bring the issue outside the realm of conjecture, speculation or opinion unfounded on definite facts. As an element of recoverable damages, the sufficiency of the evidence of lost profits is dependent upon whether the financial information contained in the record is such that a just or reasonable estimate can be drawn." Cargill, Inc. v. Taylor Towing Service, Inc., 642 F.2d 239, 241 (8th Cir.1981).
On the facts presented, the Court believes that plaintiff's proof of lost profits is too remote, speculative, and uncertain to permit recovery of damages for loss of use. Mr. Bockelman's testimony was not from his personal knowledge, rather, his calculations were based upon records never produced for inspection by the Court or defendant. While the Court recognizes the difficulty of proving such a voluminous amount of documents, the Court is bound by Federal Rules of Evidence which require personal knowledge on the part of witnesses such as Mr. Bockelman. See Rule 602, Federal Rules of Evidence. Any solicitude for plaintiff's hardship in producing these documents must be tempered by the requirement that damages be proven with reasonable certainty and particularity. This plaintiff failed to establish.
Prejudgment interest is to be awarded unless there are exceptional circumstances to justify refusal. Cargill, Inc. v. Taylor Towing Service, Inc., supra; U.S. v. Motor Vessel Gopher State, 614 F.2d 1186, 1190 (8th Cir.1980). The rationale behind an award of interest is restitution and full compensation. Federal Barge Lines, Inc. v. Republic Marine, Inc., 616 F.2d 372, 373 (8th Cir.1980); Mid-America Transportation Co. v. Rose Barge, Inc., 477 F.2d 914, 916 (8th Cir.1973). It is well settled award of prejudgment interest is not tied to the forum state's statutory limit. Id. Instead, the rate of interest should be fixed at a rate in keeping with interest rates prevailing at the time repairs were completed. Id.; General Facilities, Inc. v. National Marine Service, Inc., 664 F.2d 672 (8th Cir.1981) (per curiam); Sabine Towing & Transportation Co. v. Zapata Ugland Drilling, Inc., 553 F.2d 489, 490-91 (5th Cir.) cert. denied 434 U.S. 55, 98 S.Ct. 175, 54 L.Ed.2d 127 (1977). The Court's duty is to make the plaintiff whole.
Defendant argues that a good faith offer to settle is an exceptional circumstance warranting the denial of prejudgment interest. The Court can find no case authority for this proposition. Prejudgment interest is the rule and not the exception. See Federal Barge Lines, Inc. v. Republic Marine, Inc., 616 F.2d at 373-74. Since the Court is not convinced that peculiar or unusual circumstances abound in this *94 case, prejudgment interest will be awarded at a rate of ten per cent (10%) per annum. This rate is sufficient to fully compensate plaintiff. Accord, Federal Barge Lines, Inc. v. Republic Marine Service, Inc., 616 F.2d at 374; L & L Marine Service, Inc. v. Corf Transport Co., No. 79-1479 A (2) slip op. at 14-15 (E.D.Mo. May 12, 1981) (Judge Nangle found ten per cent (10%) per annum a fair and reasonable rate to determine prejudgment interest). Interest shall run from the time expenses were paid by plaintiff. Federal Barge Lines, Inc. v. Republic Marine Service, Inc., supra.
Based upon the above stated law and the Court's findings of fact, the following are plaintiff's recoverable damages:

OR-3412
 Repairs $11,772.16
 Survey 1,005.51 (352.86 + 652.65)
 Salvage 48,767.78
OR-225
 Repairs $12,005.00
 Survey 336.83
 Drydocking 369.73
OR-3548
 Repairs 573.59
 Survey 136.83
OR-3830
 Repairs 3,600.00
 Survey 336.83
 __________
 Total Damages $78,904.26
Interest Rate of 10% per annum from the time
damages were paid by plaintiff.