595 F.Supp. 356 (1984)
SCNO BARGE LINES, INC., Plaintiff,
v.
SUN TRANSPORTATION CO., INC. a corporation, and the United States of America, Defendants.
No. 81-1555 A (5).
United States District Court, E.D. Missouri, E.D.
May 14, 1984.
*357 John S. Sandberg, Shepherd, Sandberg & Phoenix, St. Louis, Mo., for plaintiff.
Gary T. Sacks, Goldstein & Price, Joseph B. Moore, Asst. U.S. Atty., St. Louis, Mo., Stephanie J. Grogan, Civ. Div., Torts Branch, U.S. Dept. of Justice, Washington, D.C., for defendants.

MEMORANDUM OPINION
LIMBAUGH, District Judge.
This matter is before the Court for a decision on the merits after trial to the Court, sitting in admiralty. Plaintiff brought this action for damages to its barges against defendant Sun Transportation Company, alleging negligence in the towing of its barges on October 30, 1980, on the Missouri River, and against the United States under the Suits in Admiralty Act, 46 U.S.C. § 741 et seq. alleging negligence of the United States, acting through the Coast Guard and the Corps of Engineers, *358 in the proper maintenance of the waterway. Both defendant Sun Transportation and the United States (hereinafter referred to as defendant Government) have filed cross-claims.
After consideration of the testimony and exhibits introduced at trial, and the parties' stipulations and briefs, the Court makes the following findings of fact and conclusions of law in accordance with Rule 52 Federal Rules of Civil Procedure.
Plaintiff, SCNO Barge Lines, Inc. (SCNO) is a corporation duly organized and existing under law and is the owner or operator of Barges SCNO 1535, SCNO 1446, SCNO 1322, SCNO 1483, SCNO 1434, SCNO 1450 and FUJA 106. The barges are 195 feet long by 35 feet wide. At all relevant times, the barges were being towed pursuant to a charter contract between plaintiff and defendant Sun Transportation.
Defendant Sun Transportation Company, Inc. (Sun), is a corporation duly organized and existing under law and is the owner and operator of the M/V DAN C. BURNETT, a river towboat which is 162 feet long and 45 feet wide and which is powered by four diesel engines which develop a total of 5600 horsepower. The M/V DAN C. BURNETT is equipped with radios, radar and fathometer (depth finder) as well as all other required navigational equipment. The M/V DAN C. BURNETT is in all respects seaworthy.
The United States of America is a sovereign nation which, through its agencies, the Corps of Engineers and Coast Guard, maintains and marks with buoys the navigable channels of the Missouri River.
At all relevant times, that portion of the Missouri River which was the scene of the accident is commonly referred to as Mile 246. It is located at Bushwacker Bend, just downstream from the confluence of the Grand and Missouri Rivers.
Mile 246 has, at times, what is known as a "moving bottom" (sediment carried in and out of river floor) and shoals (build-up of sediment) which rise and fall intermittently within a matter of a few hours.
Both the Coast Guard and the Corps of Engineers provide a variety of certain services to assist navigation on the Missouri River. Both agencies attempt to maintain and mark where necessary, without dredging, a navigable channel of approximately 9 feet in depth and 300 feet in width. Marking a navigable channel usually is done by placement of buoys and other marking devices called nuns. Black buoys mark the righthand extreme and red nuns mark the lefthand extreme of deep water as a vessel proceeds downbound on the Missouri River. Chief Parsons (Coast Guard Chief of Aids to Navigation) testified that the Coast Guard is aware of the heavy reliance placed by mariners upon the accuracy of the buoys and that buoys are re-checked more often in known problem areas.
Both agencies regularly patrol the river, "sounding" it so as to ascertain conditions relevant to navigation. The findings by these patrols are reported under certain standardized procedures.
With respect to the Coast Guard, the findings of its patrols are published weekly in its Local Notice to Mariners and broadcasted at regular intervals on the Coast Guard radio station. Captains Oberle and Herbst (pilots on the M/V DAN C. BURNETT) testified that they regularly tuned in to these broadcasts.
With respect to the Corps of Engineers, channel inspectors prepare reports in instances where, during the course of sounding, they find less than 9 feet of water depth in the navigation channel. These findings are relayed to the Corps office in Napoleon, Missouri. Commercial vessels regularly check in with the Corps office and receive information concerning river conditions. The Corps also prepares Boat Reports, a daily compilation of information regarding river conditions. The DAN C. BURNETT was in contact with the Corps office on a virtual daily basis prior to October 30, 1980.
The Corps of Engineers also prepares written steering directions which describe *359 shallow areas of the river discovered during sounding. These steering directions are transmitted to vessels through "mail boxes" strategically placed along the river. Captains Oberle and Herbst testified of their knowledge and customary use of these mailboxes.
In addition to providing radio reports and steering directions, the Corps occasionally stations a boat at known trouble spots on the river. The deposition testimony of Channel Inspectors and Channel Boat Operators Vanderwerken, Nolte and Bower reveal the customary practice of the Corps to station a vessel to assist towboats in an area where at least six groundings in a one-month period had occurred. Captains Oberle and Herbst testified of knowledge of this practice.
At least six groundings occurred in the area of Mile 246 of the Missouri River, within a one month period, prior to the October 30, 1980 grounding of the DAN C. BURNETT.
The Corps of Engineers had a regular vessel assigned to an area of the Missouri River which included Mile 246 during the months of September, October and November, 1980. The vessel sounded the channel and issued information regarding same.
Mile 246 was within the assigned area of the Coast Guard Cutter OBION, a buoy tender, during the time period in question.
On October 26, 1980, the Coast Guard Cutter OBION sounded Mile 246 and set buoys marking a navigation channel.
On October 27, 1980, the DAN C. BURNETT, with barges in tow, grounded at the lower end of Mile 246. Captain Oberle reported the grounding to the Coast Guard and to the Corps of Engineers. The Coast Guard Cutter OBION sounded and rebuoyed the area on October 28, 1980. A Local Notice to Mariners was released and a broadcast dispatched (No. 3901-80) as follows:
Shoaling previously reported from Mile 246.0 to Mile 246.8 MOR (Missouri River) has been remarked and rebuoyed. Mariner transitting [sic] this area from Chariton DM [daymark] 246.8 L/B [left bank] down to a white flag approx. 300 ft. Then cross to a R/B temp DMK [right bank temporary daymark] approx. 200 yrds. above Bushwacker Lt. [light] 246.0 R/B with a channel width of 200 ft. wide, channel rebuoyed with 3 black cans 8 ft. and 2 red nuns 8½ ft. Waverly gauge reading 11.3R. 28 October 80.
The Corps of Engineers issued a channel report and steering directions stating that the Corps had found a depth of 8½ feet for a length of 300 feet at Mile 246 on October 28, 1980.
On October 30, 1980, the DAN C. BURNETT was downbound on the Missouri River with 9 loaded barges in tow. The deepest reported draft of the barges in tow was 8 feet 3 inches.
On the morning of October 30, 1980, the DAN C. BURNETT, with its tow, passed the Coast Guard Cutter OBION. Captain Oberle had radio contact with Captain Pierce of the OBION as the OBION was going upstream. Also that morning, the DAN C. BURNETT had radio communication with the M/V LESTA K, several hours after the LESTA K had passed through Mile 246 going upstream.
On October 30, 1980, at some point in time in the afternoon, the DAN C. BURNETT, piloted by Captain Herbst, grounded approximately in the middle of the marked navigation channel at Mile 246.
The following barges were damaged in the accident of October 30, 1980: SCNO 1434, SCNO 1535, SCNO 1483, SCNO 1446, FUJA 106, SCNO 1450 and SCNO 1322. Barges SCNO 1434, SCNO 1322 and FUJA 106 were repaired following the accident. SCNO 1535, SCNO 1483, SCNO 1446 and SCNO 1450 have not had permanent repairs made as a result of the damages sustained on October 30, 1980.
Shortly after the October 30, 1980 grounding, the Corps of Engineers sounded the area and discovered 5½ feet to 6 feet of water within the navigation channel. The Coast Guard investigation revealed the proximate cause of the accident to be reduction *360 of the water depth (to below 9 feet) due to shoaling.
The Court finds the stipulated damage summary in the amount of $60,918.93 to be fair and accurate. This includes damage to the following barges: SCNO 1434  $7,280.28, SCNO 1535  $2,430.42, SCNO 1483  $11,873.00, SCNO 1446  $250.00, SCNO 106  $37,540.85, SCNO 1450  $600.00 and SCNO 1322  $944.38. The Court further finds only two repair bills to be in dispute: a cleaning charge of $1,525.00 and a billing for the repair costs on Barge SCNO 1322 in the amount of $37,656.44.
This is an admiralty and maritime claim within the meaning of Rule 9(h), Federal Rules of Civil Procedure, and this Court has jurisdiction thereof pursuant to 28 U.S.C. § 1333.
Plaintiff seeks to impose liability upon both defendants in this case on related theories. Firstly, plaintiff avers that the government should have advised the M/V DAN C. BURNETT that the buoys re-set at Mile 246 on October 28, 1980 were unreliable as of October 30, 1980 or that Mile 246 was experiencing rapid shoaling and a moving bottom. Secondly, plaintiff avers that defendant Sun Transportation should have been aware of the unreliability of the buoys at Mile 246 and that the channel was moving. The government denies any mandatory legal duty to have supplied such information to the M/V DAN C. BURNETT and that defendant Sun Transportation was solely negligent in its decision as to manner of navigation through Mile 246. Defendant Sun Transportation denies any liability because it avers that it navigated into a marked channel and hit an unknown obstruction. Defendant Sun Transportation further avers that its decision as to navigation of Mile 246 was based upon reliance on the Coast Guard and Corps of Engineer's established practices pertaining to buoyage, dissemination of navigation information and placement of vessels at problem areas to assist commercial tows.
A tug also known as a motor vessel (M/V) or towboat, is not liable as an insurer or as a common carrier. Stevens v. The White City, 285 U.S. 195, 202, 52 S.Ct. 347, 350, 76 L.Ed. 699 (1932); Mid American Transportation v. National Marine Service, Inc., 497 F.2d 776, 779 (8th C 1974), cert. denied, 425 U.S. 937, 96 S.Ct. 1671, 48 L.Ed.2d 179 (1976). A tug owes its tow a duty to exercise the reasonable care and maritime skill that prudent navigators employ in performing similar services. Stevens, supra, Mid-American Transportation, supra, Consolidated Grain and Barge Co. v. Flowers Transportation, 538 F.Supp. 65, 71 (E.D.Mo.1982); Consolidated Grain and Barge Co. v. Wisconsin Barge Line, 522 F.Supp. 842, 847 (E.D.Mo. 1981); Mid-American Transportation Co. v. Gladders Towing Co., 492 F.Supp. 475, 477 (E.D.Mo.1980); Massman Construction Co. v. Sioux City and New Orleans Barge Lines, 462 F.Supp. 1362, 1365-1366 (W.D.Mo.1979); U.S. v. Federal Barge Lines, 433 F.Supp. 53, 56 (E.D.Mo.1977). The burden is on the plaintiff, as the party asserting negligence to prove it. Stevens, supra; Mid-American Transportation, supra; Consolidated Grain and Barge Co. v. Flowers Transportation, supra.
This standard of care was distinctly described by the Supreme Court in 1875:
"But the pilot of a river steamer, like the harbor pilot, is selected for his personal knowledge of the topography through which he steers his vessel. In the long course of a thousand miles in one of these rivers, he must be familiar with the appearance of the shore on each side of the river as he goes along. Its banks, towns, its landings, its houses and trees, and its openings between trees, are all landmarks by which he steers his vessel. The compass is of little use to him. He must know where the navigable channel is, in its relation to all these external objects, especially in the night. He must also be familiar with all dangers that are permanently located in the course of the river, as sandbars, snags, sunken rocks or trees or abandoned vessels or barges. All this he must know and remember and avoid." *361 Atlee v. N.W. Union Packet Co., 88 U.S. (21 Wall.) 389, 396, 22 L.Ed. 619 (1875).
The issue before the Court as to defendant Sun is whether, under the circumstances of this case, Sun exercised the standard of care required by the Supreme Court and the 8th Circuit. The Court concludes that plaintiff has shown by the preponderance of the evidence that the captain and pilot of the DAN C. BURNETT in navigating Mile 246 did not exercise the reasonable care that a prudent tugboat navigator should have exercised.
While it has been established within the 8th Circuit that if a vessel, while inside a channel, strikes an unknown navigational obstruction, the vessel is not negligent, this is not the case here. Mid-American Transportation v. National Marine, at 779; U.S. v. Federal Barge Lines, at 57; Dairyland Power Cooperative v. Federal Barge Lines, 414 F.Supp. 40, 42 (E.D.Mo. 1976). The credible evidence shows that the shoaling at Mile 246 was not unexpected and that defendant Sun Transportation should have been on notice of its occurrence and taken precautions.
Captains Herbst and Oberle testified they knew Mile 246 to be particularly hazardous during October, 1980. There had been at least 6 prior groundings at Mile 246 within a month's time; in fact, the DAN C. BURNETT had grounded at Mile 246 on October 26, 1980, just four days before the accident from which this suit arises.
Although aware of Mile 246's propensity for rapid shoaling, defendant Sun seeks to justify its decision to navigate Mile 246 because it relied upon the buoys set and the information purportedly received from the Coast Guard and Corps of Engineers. Both Captains Herbst and Oberle testified that their reliance on buoys is not absolute; they understood that buoys are simply navigational aids, not guarantees of a navigable channel. Captain Herbst admitted that several factors influence his navigation decisions such as river reports by the Coast Guard, Corps of Engineers, or other commercial vessels and the length of time passed since a buoy had been set. He testified that he knew shoaling could take place in as little as two hours. He further testified that the Channel Report issued by the Corps of Engineers on October 28 only referred to the status of Mile 246 as of October 28.
In Atlee, the Supreme Court detailed what a towboat pilot needs to take into account when making navigational decisions. The navigators of the M/V DAN C. BURNETT knew that Mile 246 was not a portion of the Missouri River that was easily navigated during October, 1980. Information supplied to defendant Sun by the Coast Guard and Corps of Engineers through its navigational aids are to be utilized by mariners. Yet such information is not to be relied upon solely. See 33 C.F.R. § 62.15-1 which warns mariners that navigational aids are generally reliable but not infallible. Based upon the information available to Captains Herbst and Oberle, as well as their personal knowledge and experience navigating the area, they should have known that rapid shoaling and a moving bottom could probably cause grounding, which is precisely what occurred.
Even though the credible evidence establishes the liability of defendant Sun Transportation, the Court concludes that defendant Sun Transportation does not stand alone in responsibility for the grounding on October 30, 1980. The government also breached its duty of due care owed to mariners on the Missouri River.
The Suits In Admiralty Act (46 U.S.C. §§ 741 et seq.), under which this complaint was filed, equates the standard of duty owed by the tow to that of a private person in like circumstances, i.e. a standard of due care. Canadian Pacific Ltd. v. U.S., 534 F.2d 1165, 1168 (5th C 1976). This standard is applicable to government agencies such as the Coast Guard and Corps of Engineers. Transorient Navigators v. M/S Southwind, 714 F.2d 1358, 1364 (5th C 1983); Teich v. U.S., 500 F.Supp. 891 (D.Ill.1980).
Generally, the responsibility of the Coast Guard with respect to the establishment, *362 maintenance, and operation of aids to maritime navigation is set out in 14 U.S.C. §§ 2 and 81(1). 14 U.S.C. § 81(1) reads as follows:
"In order to aid navigation and to prevent disasters, collisions, and wrecks of vessels and aircraft, the Coast Guard may establish, maintain and operate aids to maritime navigation required to serve the needs of the armed forces or of the commerce of the United States."
Detailed regulations regarding the Coast Guard's responsibilities in connection with aids to maritime navigation are set forth in 33 C.F.R. §§ 60.01-1 through 72.05-10.
The majority of the courts have found that 14 U.S.C. § 81(1) does not impose a mandatory duty upon the Coast Guard to establish navigational aids. This function is left to the Coast Guard's discretion. Indian Towing Co. v. U.S., 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955); Afran Transport Co. v. U.S., 309 F.Supp. 650 (D.N.Y.1969), aff'd on other grounds 435 F.2d 213 (2nd C 1970) cert. denied 404 U.S. 872, 92 S.Ct. 72, 30 L.Ed.2d 116 (1971). Whether the function of establishing navigational aids is regarded as mandatory or discretionary, it is generally held that once the Coast Guard has exercised this function, it is obligated to use due care in maintaining the navigational aids established. Indian Towing, supra; Afran Transport, supra; Agri-Trans Corp. & Barry Rose v. M/V Clarence G. Frame, Ingram Barge, and U.S., (E.D.Mo.  unpublished decision, J. Wangelin, Dec. 30, 1983).
The Court finds that under the circumstances here, the Coast Guard did breach its duty of due care in the maintenance of a safe waterway. At least six groundings in one month's time occurred at Mile 246 (prior to October 30, 1980 grounding) yet not one safety report stating the unreliability of the buoys due to rapid shoaling was issued. After the re-setting of the buoys on October 28, no notice in regards to rapid shoaling was broadcast, even though the channel had shifted in less than 24 hours and there was reason to believe it would continue to do so.
The testimony of the Coast Guard's own officers clearly indicates that its own policies and established practices were not followed in this particular instance. Annex K of the 2nd Coast Guard District Operation Plan sets forth the policies and practices of the Coast Guard in order that it may "facilitate the safe and economic movement of marine transportation." Appendix 2 (to Annex K) outlines the "minimum standards for frequency of service", in regards to the scheduling and frequency of patrols. Aids on the Missouri River are patrolled (at a minimum) every twelve days. Appendix 4 deals with the setting and maintenance of buoys. The Coast Guard recognizes that "most buoys in this district are subject to an ever-changing adverse swift water environment" but because buoys are "of primary importance to the pilot on the Western Rivers", a "constant effort" must be made to maintain a reliable floating aids system. Furthermore, because buoys are heavily relied upon by pilots despite their instability due to an adverse water environment, the Coast Guard has set forth certain discrepancy response guidelines. Appendix 5 prescribes the policy for responding to aids to navigation discrepancies in the 2nd district. Defendant Sun places great emphasis on this portion of Annex K (especially 2(a)(1)) as forming the basis for the government's responsibility. The relevant part reads as follows:
2. PRIORITY DISCREPANCY RESPONSE CRITERIA
a. Discrepancies which fall under one or more of the following categories shall be corrected within 24 hours: All discrepancy reports shall be fully documented or verified before a Group Commander dispatches a servicing unit.
(1) When it is reported that buoys marking an entire crossing or section of a river are missing or off position, or that there is serious shoaling or that the channel has shifted to the extent that established aids do not mark the channel or that there are long delays *363 or a backup of traffic and/or multiple groundings in the area.
The government claims that Appendix 4, Section 2(a)(1) requires notice that the conditions in the buoyed channel have changed since the last time the buoy was set. It is contended that since no one had actually reported serious shoaling between October 28 and October 30, Captain Pierce was not obligated to deviate from the routine 12-day patrol cycle. The Court cannot agree with such an interpretation of this section. Appendix 5's primary purpose is to provide guidelines for response to a potentially dangerous situation. Captain Pierce was fully aware of the serious shoaling at Mile 246 and personally on notice that the shoaling was definitely affecting the reliability of the buoys set. There was every indication that since serious shoaling had been constant and the buoys set on October 26 were unreliable on the 28th, that the buoys re-set on the 28th would also be unreliable again forty-eight hours later. The Coast Guard Cutter OBION was within the vicinity, only 18 miles away at one point. Resetting the buoys, at least on October 29 would not have been a hardship on the Coast Guard and certainly within the mandate of Annex K.
The Corps of Engineers also breached its duty of due care owed to mariners. 33 C.F.R. § 209.325(g)(s) and (n) require the Corps of Engineers to disseminate detailed information regarding channel conditions, especially uncharted shoals. The Missouri River is regularly sounded and the results are transcribed into channel reports. Channel Inspectors Nolte, Vanderwerken, and Bower (deposition testimony) testified that Mile 246 was a particularly bad spot during October, 1980 and had to be sounded at least ten times (much more than usual). Captains Herbst, Oberle and Carroll testified that channel reports routinely include channel depth and information pertaining to shoaling and moving river bottoms. The evidence also indicates that these channel reports are heavily relied on by navigators on the Missouri River. There was also testimony about the Corps of Engineer's customary practice of stationing a vessel at known trouble spots on the river.
The last channel report (prior to the October 30 grounding) was issued by the Corps of Engineers launch OSAGE III on October 28. That channel report only stated the depth of the channel  8½ feet deep. The report contained nothing about shoaling or the moving river bottom at Mile 246. The omission of such information rendered this channel report inaccurate and misleading.
Information regarding rapid or serious shoaling and a moving river bottom is vital to a pilot's navigation decision. The failure to issue a channel report with this information constitutes a breach of the Corps of Engineer's duty in advising pilots under its own regulations.
Although the parties stipulated plaintiff's substantial damages in an amount of $60,918.93, two repair bills, both regarding SCNO Barge 1322, remain in dispute. Plaintiff has presented a cleaning bill in the amount of $1,525.00 and a repair bill in the amount of $37,656.44. Defendant Sun disputes the cleaning bill and will only acquiesce to a repair estimate of $13,312.00.
All the parties agree that Barge 1322 had old bottom and bildge knuckle damage, i.e. damage sustained prior to the grounding on October 30, 1980. The issue is the extent of the new damage and whether the cleaning and repair bills reflect work due solely to the grounding on October 30, 1980. A primary point of contention appears to be the damage sustained in the bowrake compartment of the barge. Plaintiff asserts that the repair bill is only for damages sustained in the grounding and this includes damage to the bowrake compartment. Defendant Sun asserts that the only damage sustained by Barge 1322 was on the port side of the stern and in the area of the major holing in the starboard No. 1 wing compartment.
Plaintiff supports its damages by the deposition testimony of Captain Clemmons Zane. Captain Zane is a marine surveyor *364 of 10-12 year's experience with over 40 years in various aspects of the marine industry. He has done barge surveys before, although not extensively. On January 19, 1981, he surveyed (along with defendant Sun's expert, Stanhope Hopkins) Barge 1322 while it was drydocked. His report reflects his findings without any prior information regarding Barge 1322 from plaintiff. Essentially his findings are similar to Mr. Hopkins, findings, except as to the damage of the bowrake compartment. He believes that the barge did strike and slide along the dike, thereby damaging the bowrake compartment, as evidenced by the presence of water (found in barge by plaintiff SCNO when it received it from defendant Sun 12 days after the grounding). He determined that the damage, attributable solely to the grounding, amounted to $37,000 or more. He further testified that he believed Mr. Hopkins' contrary findings are premised on adoption of the findings made by defendant Sun's other marine surveyor, Mr. Steven Lindsay.
Mr. Lindsay surveyed Barge 1322, on November 1, 1980, while it was still at Mile 246. Mr. Lindsay has been in the marine industry for approximately 10 years; 4 years as a marine surveyor and 6 years as a deckhand or mate. He has made several hundred barge surveys. He inspected the barge while it was still loaded and could not view the bottom plate. Although his report makes no mention of the presence of water, he testified both at deposition and later in court to water in the barge. He further testified that he was told by either the captain or the pilot of the towboat that there had been no water in Barge 1322 prior to the grounding.
Defendant Sun concedes that there was water present in the bowrake compartment but avers that the water entered the bow through an old crack in the bulkhead. The Court finds no credible evidence to support this explanation. After reviewing the reports and all the experts' testimony, the only supported fact is that there was no water in the bow before the grounding but there was water in the bow after the grounding. The Court further finds that the origin of the damage repaired on Barge 1322 is the grounding on October 30, 1980 as testified to by Captain Zane. Mr. Lindsay never saw the barge below the river line and he testified to omissions in his report. Mr. Hopkins' only disagreement with Captain Zane was as to the damage in the bowrake compartment but Mr. Hopkins was basing his findings on Mr. Lindsay's inconclusive report. The evidence adduced supports plaintiff's repair bill of $37,656.44.
On the other hand, the evidence presented does not support plaintiff's cleaning bill of $1,525.00 for Barge 1322. Although Captain Zane testified to the necessity of cleaning before the repair work, there was evidence that the cleaning was required due to a cargo change from soybean to molasses. Plaintiff failed to carry its burden of showing by a preponderance of the evidence that the cleaning was a necessary pre-requisite to the repair work on Barge 1322. Therefore, the cleaning costs for Barge 1322, in the amount of $1,525.00 will be disallowed.
The next issue to be addressed is the award of prejudgment interest against both defendants. The general rule in admiralty cases is that prejudgment interest should be awarded absent exceptional circumstances. Consolidated Grain and Barge Co. v. Archway Fleeting and Harbor Service, 712 F.2d 1287, 1290 (8th C 1983); Federal Barge Lines, Inc., v. Republic Marine, Inc., 616 F.2d 372, 373 (8th C 1980); Mid-American Transportation Co. v. Rose Barge Lines, 477 F.2d 914, 916 (8th C 1973); Ohio River Co. v. Great Lakes Carbon Corp., 562 F.Supp. 61 (E.D. Mo.1982) 714 F.2d 63 (8th C 1983) (reversed in part on other grounds); Ohio River Co. v. Peavey Co., 556 F.Supp. 87 (E.D.Mo. 1982). Prejudgment interest is to be computed from the time expenditures for repairs were actually made, i.e. the time of payment. Federal Barge Lines v. Republic Marine, at 373; Mid-American Transportation Co. v. Cargo Carriers, Inc., 480 F.2d 1071, 1074 (8th C 1973); Mid-American Transportation v. Rose Barge, at 916.
*365 Although the rationale behind an award of prejudgment interest is restitution and full compensation, the setting of the prejudgment interest rate is discretionary with the court. Federal Barge Lines v. Republic Marine, at 373; U.S. v. M/V GOPHER STATE, 614 F.2d 1190 (8th C 1980); Mid-American Transportation v. Rose Barge, at 916; Ohio River v. Peavey, at 93. This Court is not bound by the forum state statutory interest rates. Id. Plaintiff contends that the prevailing interest rate at the time repairs were made was 14.4%. Defendant Sun contends that the usual prejudgment interest rate in the Eastern District of Missouri is 10%. It has been held in this circuit that the prejudgment interest rate should be fixed at a rate in keeping with prevailing rates at the time repairs were made. General Facilities, Inc. v. National Marine Service, Inc., 664 F.2d 672, 674 (8th C 1981); Federal Barge Lines v. Republic Marine, at 373-374; U.S. v. M/V GOPHER STATE, at 1190; Ohio River v. Peavey, at 93. These cases held that prevailing rates were a guide to the Court and that the Court should consider the prevailing rates along with the evidence adduced, in setting the prejudgment interest rate. Id. If the evidence established the prevailing rate as fair and reasonable, then the prejudgment interest was so fixed, otherwise the Courts usually set 10% as being fair and keeping with prevailing rates. Id.
Plaintiff has not submitted any evidence to support its contention that the prevailing rate at the time repairs were made was 14.4% or whether this was the average prime rate or simply the lending rate available to it. In fact, defendant Sun asserts that plaintiff did not borrow money to make repairs and plaintiff has not denied this assertion. This Court is not convinced that 14.4%, as the prevailing interest rate at time repairs were made, is the proper standard at which to fix the prejudgment interest award. Prejudgment interest therefore will be awarded at a rate of ten percent (10%) per annum. This rate is sufficient to compensate the plaintiff fairly and shall be computed from the date repairs were made on each barge in question.
Prejudgment interest shall only be recovered against defendant Sun. In an admiralty action against the United States brought under the Suits in Admiralty Act, 46 U.S.C. § 741 et seq., prejudgment interest may be awarded. Specifically, Section 743 allows for a maximum of 4% per annum to run as ordered by the Court. The language in Section 743 is not mandatory either to allowance of prejudgment interest or as to the period of computation, therefore this Court chooses not to award plaintiff prejudgment interest against the government. See, Richmond Marine Panama, S.A. v. U.S., 350 F.Supp. 1210 (D.N. Y.1972).
Based upon the stated law and the Court's findings of fact, liability for the grounding of the DAN C. BURNETT on October 30, 1980, is to be apportioned between the defendants at a ratio of 40% against the government and 60% against the defendant Sun Transportation. In light of this determination, the Court will dismiss the crossclaims filed by each of the defendants. The following are plaintiff's recoverable damages:

 SCNO 1434 $7,280.28
 SCNO 1535 2,430.42
 SCNO 1483 11,873.00
 SCNO 1446 250.00
 SCNO 106 37,540.85
 SCNO 1450 600.00
 SCNO 1322 38,600.82
 _________
 TOTAL DAMAGES $98,575.37

Of this sum, defendant Sun Transportation Co., Inc., shall be responsible for $59,145.23 with interest at the rate of 10% per annum from the time damages were paid by plaintiff and defendant United States of America shall be responsible for $39,430.14 with interest from the date of this opinion.